Enrique López Delgado, demandante y apelado, *v.* South Porto Rico Sugar Company of Puerto Rico, demandada y apelante.

Núm. 8645—*Sometido:* Mayo 21, 1943. *Resuelto:* Junio 14, 1943.

*F. Manuel Toro* y *R. Castro Fernández*, abogados de la apelante; *J. Alemañy Sosa*, abogado del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

A fines de 1937 el demandante y la demandada celebraron un contrato verbal de molienda de cañas de azúcar a virtud del cual la demandada convino en moler las cañas del demandante de variedades superiores, procedentes de las fincas de éste radicadas en el término municipal de Cabo Rojo, durante la zafra de 1937–38, bajo los términos regulares de molienda, pagadero su importe dentro de los primeros quince días del mes subsiguiente a la entrega de las cañas. Para la fecha en que se celebró el contrato estaba ya en vigor la Ley núm. 112, aprobada el 13 de mayo de 1937 (Leyes de 1937, pág. 271), cuyas secciones 11, en lo pertinente, y 15, literalmente, dicen así:

"Sección 11.—Las liquidaciones del azúcar que corresponda al colono se librarán por la central quincenal o mensualmente, según se haya convenido, tomándose como valor del azúcar para su liquidación el precio promedio, quincenal o mensual correspondiente a la quincena o mes en que se haya entregado la caña, de las ventas de azúcar de 96 grados polarización en el mercado de Nueva York, a cuyo precio

promedio se descontará para gastos de ensacado y flete una cantidad que no será mayor de quince (15) centavos por quintal; . . . ''

"Sección 15.—Todo contrato o práctica, hecho o implantado, en contravención de las disposiciones del presente estatuto será nulo e inexistente.''

De conformidad con dicho contrato el colono entregó sus cañas a la Central. Ésta las molió durante los meses de enero a mayo de 1938 y a virtud del reajuste que hizo en diciembre de 1939, a que más adelante haremos referencia, se ajustó al contrato y a las disposiciones de la citada Ley núm. 112, con excepción del descuento para ensacado y flete prescrito por la sección 11, supra, por el cual concepto la Central descontó al colono 25 centavos en vez de una cantidad no mayor de 15 centavos por quintal de azúcar.

Poco después de empezar a regir la citada Ley núm. 112, su constitucionalidad fué impugnada por otra persona. Mientras se determinaba definitivamente la validez de la ley, la Central, con carácter provisional, venía haciendo el indicado descuento de 25 centavos, en contravención del citado precepto legal. Así las cosas, y sin haberse resuelto en definitiva la cuestión constitucional pendiente en los tribunales, se aprobó en 15 de mayo de 1938 la Ley núm. 213 (Leyes de 1938, pág. 428), a virud de la cual fueron enmendadas varias secciones de la Ley núm. 112, entre ellas la 11, y de conformidad con dicha enmienda se autorizó a las Centrales a "descontar para gastos de ensacado, flete, seguro marítimo, comisiones, arbitrios insulares y todo otro gasto relacionado con la venta de azúcar en el mercado de Nueva York, una cantidad que no excederá de veinticinco (25) centavos por quintal, libre de todo impuesto; . . . ''

Mientras tanto, la sentencia de la Corte de Distrito de los Estados Unidos para Puerto Rico, declarando constitucional la Ley núm. 112, fué confirmada por la Corte de Circuito de Apelaciones para el Primer Circuito con fecha 13 de junio de 1939 (*Vidal* v. *Fernández*, 104 F. (2d) 606), y posteriormente, en 6 de noviembre de 1939, la Corte Suprema

de los Estados Unidos denegó la solicitud de *certiorari* que para revisar dicha sentencia fué presentada en aquel tribunal (*Vidal, Receiver,* v. *García, Attorney General of P. R., et al.,* 308 U.S. 602), quedando así definitivamente sostenida la constitucionalidad de la citada Ley núm. 112.

Fué en 12 de diciembre de 1939, después de haberse sostenido definitivamente la constitucionalidad de la Ley núm. 112, que la Central reajustó la liquidación en la forma que, dijéramos anteriormente, manteniendo siempre el descuento de 25 centavos en vez de 15 centavos por quintal de azúcar. Basó su alegado derecho a descontar 25 centavos por ese concepto, en que antes de resolverse definitivamente la constitucionalidad de la ley, la sección 11 había sido enmendada por la Ley núm. 213 de 1938 en la forma que ya conocemos. En opinión de la Central, como la Ley núm. 213 de 1938 no contenía ninguna salvedad respecto a los derechos adquiridos al amparo de la sección 11 de la Ley núm. 112, la enmienda de que fué objeto dicha sección, autorizando a la Central a descontar 25 centavos por quintal de azúcar, tenía según ella efecto retroactivo y debería considerarse como si la ley hubiese sido siempre como resultaba de acuerdo con dicha enmienda. De ahí que al practicar dicho reajuste el 12 de diciembre de 1939, enviase al colono un cheque por $281.60, el cual no incluía, por supuesto, la diferencia entre 25 centavos y 15 centavos del descuento antes mencionado.

Conviene consignar que al dorso del indicado cheque por $281.60, conforme lo había hecho en cheques anteriores, la Central hizo constar lo siguiente: "Endorsement hereof by the payee is acknowledgment of full payment and satisfaction of the statement which was attached to the voucher and bears this same date and serial number." Vertido al castellano, dicho endoso dice así: "El endoso de este documento por la persona a cuya orden se extiende, constituye reconocimiento de pago en saldo del estado que acompañó al libramiento y que lleva esta misma fecha y número de serie."

El 22 de diciembre de 1939 el Colono endosó y cobró el citado cheque por $281.60; pero reclamó a la Central los 10 centavos por cada quintal de azúcar, montantes a $789.15, cantidad que alegaba él le había sido indebidamente retenida por la Central. Habiéndose negado ésta a pagarla, el Colono instó este pleito, reclamando dicha suma, con el interés legal desde el día 15 del mes subsiguiente al de las entregas de caña, hasta su total pago, más las costas y honorarios de abogado.

En su contestación la Central alegó varias defensas que virtualmente se reducen a que la demanda no aduce hechos constitutivos de causa de acción, a que la enmienda de que fué objeto la sección 11 de la Ley núm. 112 a virtud de la núm. 213 tenía efecto retroactivo a las fechas de las entregas de las cañas, y a que el cobro del cheque por $281.60 con el endoso que hemos transcrito tuvo el efecto legal de una aceptación como finiquito (*accord and satisfaction*) que puso fin a toda reclamación por parte del demandante.

La corte inferior dictó sentencia a favor del colono por la cantidad de $789.15 reclamada en la demanda, más las costas y $200 por concepto de honorarios de abogado. Contra esa sentencia interpuso la Central el presente recurso.

██ La contención de la apelante de que la enmienda de que fué objeto la sección 11 tiene efecto retroactivo a la fecha en que empezó a regir la ley original, es decir, la núm. 112, es claramente insostenible. La Ley núm. 112 es en su totalidad una ley de carácter sustantivo y por consiguiente cualquier enmienda a la misma tiene efecto prospectivo a menos que expresamente se diga lo contrario y no perjudique derechos adquiridos al amparo de una legislación anterior. A este efecto dispone el artículo 3 del Código Civil:

"Artículo 3.—Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario.

"En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior."

· Las autoridades que invoca la apelante se refieren a leyes de carácter procesal, las cuales, conforme sostuvimos en *Mason* v. *White Star Bus Line,* 53 D.P.R. 337, 340, tienen efecto retroactivo y se aplican tanto a los casos pendientes en la fecha de su aprobación como a los futuros, a menos que de la propia ley resulte expresa o implícitamente que no fué ésa la intención del legislador.

Como la excepción previa de falta de causa de acción y la alegada falta de jurisdicción de la corte inferior para conocer de este pleito están basadas en que la enmienda en cuestión tiene efecto retroactivo y que por consiguiente el demandante no tiene derecho a reclamación alguna por el indicado concepto, lo dicho resuelve en su contra esas dos cuestiones suscitadas por la demandada apelante.

■ Pasemos a considerar ahora la defensa de *accord and satisfaction.*

No existe en esta Isla legislación alguna que de manera expresa sancione la doctrina de *accord and satisfaction,* conocida en la Ley Común desde tiempo inmemorial. Véanse los artículos de James Barr Ames en 9 Harv. L. Rev. 49, y 12 Harv. L. Rev. 515, titulados *Specialty Contracts and Equitable Defences* y *Two Theories of Consideration,* respectivamente.

Este tribunal, en el caso de *Abarca Sanfeliz* v. *Bank of Nova Scotia,* 46 D.P.R. 931, 942, expresó alguna duda acerca de la aplicación de esa doctrina en Puerto Rico, al rechazar la contención del apelante, quien sostenía que dicha doctrina está sancionada por el artículo 1063 del Código Civil, diciendo:

"La doctrina de *accord and satisfaction,* suponiendo que estuviese en vigor en Puerto Rico, no es aplicable a los hechos desarrollados en el presente caso. . . . No somos refractarios y más bien nos sentimos inclinados a aceptar aquellos principios sanos y justos emanados del derecho común que sean compatibles con nuestro derecho civil y con las leyes aprobadas por nuestra Asamblea Legislativa; pero no procederíamos con acierto en estos esforzados empeños de enriquecer

y acoplar nuestra jurisprudencia sin la preparación que se obtiene por medio del estudio y de la investigación.''

Sin embargo, creemos poder ·ahora disipar la duda y sostener que la doctrina de *accord and satisfaction* rige en nuestro Derecho. Así lo resolvió el Tribunal Supremo de los Estados Unidos por voz de su entonces Juez Asociado Sr. White, cuando en el caso de *City of San Juan* v. *St. John's Gas Co.* (1904) 195 U. S. 510, 521, dijo·:

"Aunque no se nos ha citado ninguna autoridad española que demuestre que estos principios (*accord and satisfaction*) existían en la ley en vigor en Puerto Rico, toda vez que la doctrina está basada en principios conocidos en el Derecho Romano (L. 17, C. De solut), aplicados bajo el Código Napoleón (Journal de Palais Repertoire, v. 10, verbo paiement, p. 10, No. 117; Toulier, t. 12, p. 355; Duranton, t. 12, Nos. 79 y 80), no podemos vacilar en concluir que la doctrina en cuestión regía también en el Derecho Civil Español. La cuestión se reduce, pues, a determinar si la doctrina es aplicable a los hechos de este caso·."

Tampoco hemos podido nosotros encontrar algo sobre esa doctrina en las leyes españolas ni en las obras de sus comentaristas. Pero en Luisiana, donde rige un código civil muy similar al nuestro y donde no existe un precepto legal que expresamente la sancione, se ha resuelto que dicha doctrina no está sancionada por el artículo 3071 del Código Civil, equivalente al 1709 del nuestro, que define el contrato de transacción; pero dicho Estado, en su laudable empeño de enriquecer su Derecho absorbiendo aquellos principios sanos y justos propios de la Ley Común, compatibles con su sistema de jurisprudencia emanado del Derecho Romano, desde hace muchos años viene aplicando constantemente la doctrina de *accord and satisfaction*. *Davis-Wood Lumber Co.* v. *Farnsworth & Co.* (1937), 171 So. 622; *Berger* v. *Quintero* (La., 1930), 127 So. 356, 357; *Cruze* v. *Life Insurance Company of Virginia* (La., 1938), 184 So. 735.

Para que exista *accord and satisfaction* precisa el concurso de los siguientes elementos: (1) Una reclamación

ilíquida o sobre la cual exista controversia *bona fide;* (2) un ofrecimiento de pago por el deudor; y (3) una aceptación del ofrecimiento de pago por el acreedor. *Cruze* v. *Life Insurance Company of Virginia,* supra, y autoridades citadas; *Berger* v. *Quintero,* supra. Siendo requisito *sine qua non* para que la doctrina de *accord and satisfaction* sea aplicable, que la reclamación sea ilíquida o que sobre la misma exista controversia *bona fide,* parece obvio que cuando el acreedor en las circunstancias indicadas recibe del deudor y hace suya una cantidad menor que la que él reclama, el acreedor está por ello impedido de reclamar la diferencia entre lo recibido y lo por él reclamado. El acreedor, al hacérsele el ofrecimiento de pago sujeto a la condición de que al aceptarlo se entenderá en saldo de su reclamación, tiene el deber de devolver al deudor la cantidad ofrecida, si no está conforme con dicha condición. Pero él no puede aprovecharse de la oferta de pago que de buena fe le hace el deudor, para después de recibirla, reclamar el balance. De no haber aceptado la oferta de pago, el acreedor hubiera tenido que litigar en los tribunales su reclamación, con el riesgo de no poder probar quizá todo lo que el deudor estuvo dispuesto a pagar. Además, privaría con su conducta al deudor, en caso de litigio, del derecho que tendría de acogerse a lo prescrito en el artículo 313 del Código de Enjuiciamiento Civil.

Establecido que la doctrina en cuestión rige en Puerto Rico, sólo nos resta determinar si la misma es aplicable al presente caso. Que hubo un ofrecimiento de pago por la deudora demandada y una aceptación del mismo por el acreedor demandante, está fuera de duda. Pero, ¿existió en este caso el primero de los tres elementos indispensables para la aplicación de la doctrina? Indudablemente que no. Se observará que en cuanto a la exactitud de la cantidad reclamada por el demandante no existía disputa, sino simplemente en cuanto a la obligación de pagarla, por cuanto la demandada sostenía que la ley que dió origen a esa reclamación era inconstitucional. Pero cuando en 12 de diciem-

bre de 1939, la demandada apelante hizo el ofrecimiento de pago enviando al demandante apelado el cheque en cuestión, ya el Tribunal Supremo de los Estados Unidos, al denegar la expedición del auto de certiorari el 6 de noviembre de 1939, había disipado la duda que tenía la demandada en cuanto a su obligación de pagar la cantidad reclamada por el demandante. Es obvio, pues, que independientemente de la sección 15 de la Ley núm. 112 antes transcrita, que declara nulo e inexistente cualquier contrato o práctica hecho en contravención de las disposiciones del estatuto, la aceptación y cobro del cheque por el demandante no le privan de reclamar el balance adeudádole, puesto que no existió causa o consideración para aceptar una cantidad menor en pago de un crédito mayor.

■■ Por último, no podemos convenir con la apelante en la imputación de error que hace a la corte inferior por haberla condenado en costas y a pagar $200 por concepto de honorarios de abogado. Habiendo dictado sentencia a favor del demandante, la ley le imponía a la corte sentenciadora el deber de concederle las costas, y en cuanto a la condena de honorarios de abogado, no se nos ha demostrado que la corte *a quo* hiciera mal uso de su discreción al concederlos ni al fijarlos en la cantidad de $200.

*Procede, por lo expuesto, desestimar el recurso y confirmar la sentencia apelada.*