FLORENTINO FUENTES SUÁREZ, ET ALS., demandantes, apelados y apelantes, v. THE FEDERAL LAND BANK OF BALTIMORE, demandado, apelante y apelado.

Núm. 8940.—*Sometido:* Junio 16, 1944. *Resuelto:* Diciembre 4, 1944.

*Frank Martínez, S. García Díaz y M. A. García del Rosario,* abogados del demandado, apelante y apelado; *E. Martínez Rivera,* abogado de los demandantes, apelados y apelantes.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

Abdón Fuentes y su esposa Rosalía Suárez recibieron de The Federal Land Bank of Baltimore en calidad de préstamo la cantidad de seis mil dólares. Otorgaron un pagaré a favor del banco por la suma referida y para garantizarlo constituyeron el 10 de junio de 1924 hipoteca voluntaria a favor del banco sobre una finca radicada en el barrio Palos Blancos de Corozal. Se convino que la cantidad prestada debería ser pagada en veinte plazos anuales a razón de $523.30 los diecinueve primeros y $519.76 el último, y que el primer plazo vencería el primero de julio de 1925 y los siguientes respectivamente el día primero de julio de cada año sucesivo, con intereses cada plazo a razón de seis por ciento anual. Se estipuló además que en caso de no pagarse a su vencimiento la deuda hipotecaria o cualquier parte de la misma, se consideraría vencida toda la deuda. Fuentes pagó

los plazos correspondientes a los años 1925, 1926, 1927 y 1928, pero falleció el 20 de septiembre de ese último año, y desde entonces su sucesión dejó de pagar los plazos de la hipoteca y las contribuciones sobre la finca. El primero de octubre de 1930 el banco radicó en la Corte de Distrito de Bayamón un procedimiento ejecutivo en cobro de la deuda, la cual ascendió para esa fecha a $6,408.02, que incluía la partida de quinientos dólares convenida para honorarios de abogado en caso de ejecución. En el procedimiento ejecutivo fué requerida de pago la sucesión de Abdón Fuentes, compuesta de su viuda e hijos. Celebrada la subasta correspondiente el día 6 de febrero de 1931, la finca fué adjudicada al banco por la cantidad de seis mil dólares, incluyéndose en esa suma el importe de las costas, gastos y honorarios de abogado en el procedimiento, así como también el importe de las contribuciones adeudadas según memorándum sometido por el Colector de Rentas Internas de Corozal. Por escritura número 72 de 25 de marzo de 1938 el banco la vendió a José Manuel Medina por precio de cuatro mil cien dólares.

En octubre 1940 los demandantes, como herederos de Abdón Fuentes y de Rosalía Suárez, instituyeron este pleito contra el banco solicitando que se decrete la inexistencia de la deuda hipotecaria de seis mil dólares y se anule el procedimiento ejecutivo, especialmente la adjudicación de la finca al banco, y se le condene a que pague a los demandantes la cantidad de quince mil dólares, que alegan es el valor de la finca hipotecada, tres mil dólares por concepto de frutos producidos o debidos producir desde el seis de febrero de 1931, y las costas, gastos y honorarios de abogado.

Como motivo de nulidad de la deuda de seis mil dólares, los demandantes alegaron que Fuentes, en la fecha en que otorgó el pagaré y la escritura de hipoteca [1] padecía de pa-

---

[1] Si bien las partes y la corte sentenciadora se refieren al pagaré como otorgado el 2 de junio de 1924, lo cierto es que aunque fechado el 2 de junio de 1924, fué otorgado en Corozal el día 10 de junio, conforme certifica el notario en el *jurat* al calce del documento, firmando como testigos de las marcas de

resis progresiva, era demente y consecuentemente no pudo dar consentimiento válido para el otorgamiento de los documentos. Alegó además la demandante María Teresa Suárez, como única heredera de su madre Carmen Fuentes—quien a su vez fué heredera de sus padres Abdón Fuentes y Rosalía Suárez—, que cuando Carmen Fuentes fué requerida de pago en el procedimiento ejecutivo hipotecario se hallaba sufriendo de enajenación mental, circunstancia que según se alega en la demanda le constaba al banco, y que por consiguiente la corte no adquirió jurisdicción sobre dicha demandada.

En la opinión que emitió, el juez sentenciador declaró probado, entre otras cosas, que Fuentes estuvo demente padeciendo de parálisis general progresiva desde 1921 hasta su muerte, y que por lo tanto era nulo el contrato de préstamo celebrado el 10 de junio de 1924, y como consecuencia de este pronunciamiento anuló también el procedimiento ejecutivo hipotecario; fijó el valor de la finca al tiempo de ser adjudicada al banco en la cantidad de seis mil dólares; y dictó sentencia condenando al demandado a pagar seis mil dólares como valor de la finca, $8,337.36 por concepto de los frutos producidos y debidos producir, una vez descontada la cantidad de $314.64 que el banco pagó por contribuciones desde el 31 de octubre de 1940, fecha en que el demandado fué emplazado, hasta el día 30 de noviembre de 1943, cuando se dictó la sentencia apelada, más las costas y desembolsos y cuatrocientos dólares por concepto de honorarios de abogado.

Ambas partes apelaron de la sentencia.

La cuestión fundamental a resolver en este recurso es si el 10 de junio de 1924, cuando Fuentes otorgó el pagaré y la escritura de hipoteca, estaba en el goce de sus facultades mentales. Si lo estuvo, debemos determinar entonces si como se alega en la tercera causa de acción Carmen Fuentes es-

---

Abdón Fuentes y de Rosalía Suárez los señores Juan del Fresno y Antonio Valiente, quienes a la vez fueron los testigos instrumentales de la escritura de hipoteca que el mismo día y ante el mismo notario otorgaron en Corozal Fuentes y su esposa.

taba demente en la fecha en que fué requerida de pago en el procedimiento ejecutivo, y fijar el efecto de su enajenación mental sobre la validez del procedimiento ejecutivo. Si las cuestiones así planteadas son resueltas a favor del demandado, es innecesario considerar las demás cuestiones. leventadas por las partes.

El artículo 1213 del Código Civil prescribe que el consentimiento de los contratantes es uno de los requisitos indispensables para la existencia de un contrato, y el 1215 dispone que los locos o dementes no pueden prestar consentimiento. Pero como de conformidad con el 1214 el consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato, es en el instante en que tiene lugar ese concierto de voluntades cuando debe existir la capacidad para prestar consentimiento. Siendo ello así, si el alegado demente se halla en un período de lucidez al tener lugar el concierto de voluntades, el contrato es válido aunque antes o después de ese período el contratante hubiese estado loco o demente. "Cabiendo en la locura, . . . " dice Manresa, "las interrupciones, denominadas *intervalos lúcidos,* puede preguntarse si en ellos cesa la incapacidad, y aunque la ley no lo dice, puede contestarse afirmativamente, ya porque cesando la causa debe cesar el efecto, ya porque para otros actos trascendentales en la vida civil [los testamentos, por ejemplo] autoriza el legislador la eficacia de lo hecho en tales momentos de razón." Comentarios al Código Civil Español, tomo 8, pág. 606. Véase al mismo efecto Sánchez Román, Derecho Civil, tomo 4, pág. 187.

La evidencia de los demandantes revela que el 17 de mayo de 1921 Fuentes ingresó en el Hospital Presbiteriano en Santurce para someterse a una operación de hernia, la cual tuvo completo éxito; pero que al quinto día de la operación se volvió loco furioso y estaba tan violento que fué necesario sacarlo del hospital para llevarlo a su casa; que

ingresó en el Manicomio Insular el 4 de junio de 1921, y salió el primero de septiembre siguiente por hallarse mejorado de su afección mental, según certificación del superintendente del manicomio de fecha 30 de agosto de 1921; que reingresó en el manicomio el 13 de junio de 1922 y salió el 9 de septiembre del mismo año, a petición de la familia, por encontrarse mejor de su afección mental, según certificación del superintendente del manicomio de fecha 9 de septiembre de 1922; que el 27 de junio de ese año la Corte de Distrito de San Juan, en el caso civil 1065 sobre incapacidad y nombramiento de tutor, a petición de Rosalía Suárez lo declaró incapacitado por enajenación mental y le nombró tutor para regir su persona y bienes; y que el 19 de abril de 1923 la corte de distrito lo rehabilitó para regir su persona y administrar sus bienes, dando por terminada la tutela por hallarse ''en el pleno goce de sus facultades mentales.''

El doctor Urbano Ramírez, testigo de los demandantes, quien asistió a Fuentes desde el año 1921, fecha en que dicho médico estableció su oficina en Corozal, declaró que después que Fuentes salió del manicomio tenía períodos de lucidez durante los cuales se comportaba como una persona normal; que aunque a su fallecimiento no se había curado de su enajenación mental, todavía para esa fecha tenía sus períodos de lucidez; y que por lo general los intervalos lúcidos pueden durar, dos, tres, cuatro o seis meses.

El doctor Ramón Sifre declaró por los demandantes que antes de 1928 no recordaba haber prestado sus servicios a Fuentes, pero que en ese año fué llamado en consulta por el doctor Ramírez en relación con una pulmonía de que padecía Fuentes, y que pudo darse cuenta de que el paciente venía sufriendo de una etapa avanzada de neurosífilis parética, conocida también por demencia parética o parálisis general, la cual databa de algunos años. Refiriéndose a los intervalos lúcidos que ocurren en esta enfermedad, dijo que de acuerdo con la literatura médica que había leído, hay perío-

dos lúcidos que duran más de un año; que estos períodos pueden surgir sin necesidad de tratamiento, y que la lucidez puede ser tan marcada que el individuo puede volver a su ocupación y a sus actividades mentales anteriores como una persona normal. Finalmente, a preguntas del abogado de los demandantes contestó que una persona que sufre de paresis puede dar la impresión por sus actos de estar normal a pesar de que no lo está.

El doctor Luis Manuel Morales, médico especialista en neuropsiquiatría presentado por el demandado, declaró que durante sus doce años de práctica ha venido en contacto con más de cien casos de paresis, y luego de expresar los síntomas de la enfermedad, dijo que ésta se caracteriza por interrupciones; que esas interrupciones pueden durar desde un día hasta muchos años, y tienen la peculiaridad de que durante ellas los síntomas de la enfermedad receden y el individuo vuelve a sentirse como antes de enfermarse; que a veces las intermisiones ocurren espontáneamente, es decir, sin necesidad de tratamiento, y refiere casos de su experiencia personal en que han desaparecido todos los síntomas de la enfermedad y el individuo ha podido reintegrarse a la sociedad y muchas veces hasta hacer una labor útil por muchos años.

▇▇ Establecido que la demencia de que padeció Fuentes desde el año 1921 hasta su muerte se caracteriza por intervalos lúcidos, que los tuvo después de salir del manicomio y se repitieron en ocasiones posteriores y aún en la fecha de su muerte, veamos ahora si el 10 de junio de 1924, cuando otorgó el pagaré y la escritura de hipoteca, Fuentes se hallaba en uno de esos períodos de lucidez que le restituían su capacidad para contratar.

No debemos perder de vista que cuando los demandantes instaron este pleito habían transcurrido más de dieciséis años desde que Fuentes otorgó los documentos y cerca de diez desde que la finca fué adjudicada al banco en el procedimiento ejecutivo. Evidentemente la injustificada tardanza

de los demandantes ha colocado al demandado en situación desventajosa. Su dilación en la interposición del pleito ha dado lugar a que por haber fallecido el notario antes de instarse el pleito, el demandado se haya visto privado de su declaración, la cual sin duda hubiera arrojado mucha luz sobre el estado mental de Fuentes al otorgarse ante él los documentos que ahora impugnan los demandantes. También falleció Rosalía Suárez, quien hubiera podido declarar sobre el mismo extremo. Esa situación de desventaja en que los demandantes han colocado al demandado es de tenerse en cuenta a los efectos de la apreciación de la prueba.

La circunstancia de escogerse la casa de Aurelia Fuentes como sitio donde había de firmarse la escritura es una demostración de que el banco estaba actuando con manos limpias. Nada oculto hubo en el acto de firmar los documentos. De la prueba no resulta afirmativamente que en esos momentos Aurelia Fuentes estuviese presente. Tratándose, sin embargo, de que sus padres que vivían en el campo vinieron a firmar los documentos a la casa de ella en el pueblo, y considerada la trascendencia de ese acto para sus padres y hasta para ella misma, sería muy significativo que en esa ocasión Aurelia Fuentes no estuviese presente. Pero a pesar de ser ella parte en este pleito y de la inferencia que puede deducirse de que estuvo presente, no declaró en el juicio ni para negar que estuviera allí, ni para relatar sus observaciones con respecto a la forma en que se condujo su padre en aquella ocasión, si es que ella estuvo presente.

Uno de los testigos instrumentales, Juan del Fresno, declaró que el otorgamiento de los documentos tuvo lugar en la casa de Aurelia Fuentes en Corozal a las tres de la tarde; que el notario leyó la escritura en alta voz a Fuentes, a su esposa y a los testigos, y preguntó a Fuentes si estaba conforme, contestando éste en la afirmativa; que Fresno, a petición de Fuentes y del notario, firmó por el primero, quien no sabía firmar; que el acto de firmar la escritura duró

como media hora; que no observó nada de particular en Fuentes aquel día; que a su juicio Fuentes estaba dándose cuenta de lo que hacía, y que ninguno de sus familiares protestó de que se firmase la escritura.

El otro testigo instrumental, Antonio Valiente, declaró que después de estar el notario en la casa de Aurelia Fuentes, fueron llamados él y Fresno para actuar como testigos; que firmó por Rosalía Suárez, quien no sabía firmar; y que durante el otorgamiento de la escritura pudo observar que Fuentes actuó normalmente y habló poco en aquel acto.

No obstante la prueba que acabamos de reseñar, la corte sentenciadora llegó a la conclusión de que el demandado no había probado que Fuentes se hallase en un período de lucidez en los momentos en que otorgó el pagaré y la escritura de hipoteca. Examinemos el razonamiento de la corte que la condujo a esta conclusión:

"En el caso específico de Abdón Fuentes el período de remisión más largo, de acuerdo con la prueba, fué de 9 meses, o sea desde septiembre 1 de 1921, en que fué dado de baja del manicomio insular, hasta junio 13 de 1922, en que tuvo que ser reingresado.

"El doctor Morales, sin embargo, fué de opinión que si las preguntas de la solicitud de préstamo fueron contestadas personalmente por Abdón Fuentes, él tenía sus sensorios claros y estaba bien orientado, no tenía defectos groseros de la memoria y el estado de su juicio era lo suficientemente normal para que él se diera cuenta de lo que estaba haciendo.

"Desde luego que la opinión del distinguido doctor está basada principalmente en el hecho de que Abdón Fuentes contestara dichas preguntas personalmente, y es bueno recordar que para probar ese extremo no se produjo evidencia directa sino que lo fué por inferencia, trayéndose evidencia para demostrar que de acuerdo con la costumbre o práctica del banco, Abdón Fuentes tuvo que haber contestado personalmente dicho cuestionario. Esta clase de prueba no nos convenció.

"Vamos a admitir, sin embargo, que en marzo 3 de 1924, cuando Abdón Fuentes signó la predicha solicitud, se hallaba en el período de remisión que comenzó allá por abril 19 de 1923. ¿Podríamos inferir de ese hecho que él se hallaba en el mismo estado de lucidez

mental tres meses más tarde o sea en junio 2 y 10 del indicado año,(²) fecha del otorgamiento de los contratos de préstamo e hipoteca? Nuestra contestación es en la negativa porque la prueba sobre este extremo fué adversa. El doctor Morales, al declarar sobre este extremo, dijo que él no podía llegar a una conclusión específica en cuanto al estado mental de Abdón Fuentes cuando se otorgó la escritura, que probablemente persistía la remisión, pero que sin ver al paciente no se podía decir en qué grado persistía.

"Las manifestaciones de los dos testigos instrumentales en cuanto a que nada anormal ocurrió en el acto del otorgamiento de la escritura de hipoteca, no tiene tampoco gran peso en nuestra conciencia de juzgador, máxime cuando, como dijera el doctor Sifre, una persona que padece de 'paresis' o de neuro-sífilis parética, puede dar la impresión, por sus actos y conducta, de estar normal, de estar en un período de lucidez sin estarlo.

"(2) Considerada la evidencia que acabamos de analizar nuestra segunda conclusión es la de que dicha prueba no sostiene que Abdón Fuentes se hallara en un estado de lucidez mental al momento de otorgarse los predichos contratos de préstamo e hipoteca. Admitiendo, sin embargo, que el demandado hubiese establecido presuntivamente que Abdón Fuentes gozaba de lucidez mental cuando otorgó tales contratos, la prueba de los demandantes, que, en cuanto a ese particular fué practicada anticipadamente a la del demandado, al efecto de que el estado de locura de Abdón Fuentes fué continuo y persistente desde 1921 a 1928, en que murió, destruyó el efecto de la presunción."

Para la corte sentenciadora no tuvo valor probatorio la opinión del doctor Morales al efecto de que cuando Fuentes juró la solicitud para préstamo estaba en su cabal juicio. No le dió crédito porque el perito basó su opinión principalmente en el hecho de que las preguntas de la solicitud fueron contestadas por Fuentes personalmente y la evidencia que se presentó para probar que Fuentes las había contestado no le satisfizo por ser prueba indirecta. La prueba indirecta a que se refiere la corte inferior fué la declaración del notario Francisco Acevedo al efecto de que desde el año 1923 hacía para el demandado en Aguadilla el mismo trabajo que en San Juan le hacía el notario Crosas; que la

---

(²) Véase la nota número 1, pág. 201, ante.

práctica seguida por el banco para llenar la solicitud de préstamo cuando el solicitante no sabía firmar consistía en que este último comparecía personalmente ante el notario del banco y contestaba las preguntas de la solicitud conforme se las leía el notario.

Si tenemos en cuenta que las preguntas de la solicitud fueron contestadas el 3 de marzo de 1924, y que el juicio de este caso empezó el 12 de mayo de 1942, o sea dieciocho años después de jurada la solicitud; si consideramos que para esa fecha ya habían fallecido las dos personas que tomaron participación directa en llenar la solicitud, es decir, el notario Crosas y Abdón Fuentes, ¿cómo es posible exigir al demandado que presente una prueba directa que es físicamente imposible presentar? La única evidencia que podía presentar y presentó el banco era admisible, de conformidad con el inciso 13 del artículo 35 de la Ley de Evidencia, dispositivo de que podrá presentarse en juicio evidencia de "Cualesquiera otros hechos de los cuales los hechos en controversia se presumieren o pudieren lógicamente inferirse." Si la práctica a que se refirió el testigo Acevedo era la seguida por el banco y su declaración en ningún momento fué contradicha ni presentaron los demandantes evidencia alguna tendente a negar que Fuentes personalmente contestara las preguntas, se presume que se ha seguido el curso ordinario de los negocios, artículo 102, inciso 20 de la Ley de Evidencia y, por lo tanto, que la práctica establecida por el banco también fué seguida en el caso de Fuentes. Abbott, *Proof of Facts*, cuarta edición, pág. 574; Wigmore *on Evidence*, tercera edición, secciones 92 y 93; *Berthold-Jennings Lumber Co.* v. *St. Louis, I. M. & S. Ry. Co.*, 80 F. (2d) 32, 44; *Buxton* v. *Langan*, 3 A. (2d) 647, 648; *Shearer* v. *Pacific Gas & Electric Co.*, 110 P. (2d) 690, 692; *Jones* v. *Teasley*, 105 S. E. 46, 48; y *Jones* v. *Bennett*, 99 Atl. 18, 20. En tales condiciones la corte erró al no dar valor a esa evidencia.

Erró también la corte al considerar la declaración del doctor Morales como adversa a la contención del demandado

de que Fuentes se hallaba en un período de lucidez al otorgar la escritura de hipoteca. Las palabras del perito fueron, "Yo presumiría que un individuo que está en remisión de una parálisis general y que en abril 24 llena el cuestionario éste [se refiere a la solicitud para préstamo] y que se comporta en esa forma un mes después [se refiere al otorgamiento de la escritura de hipoteca] *pues probablemente persista la remisión.* Eso es todo lo más que se puede decir y en qué grado no se puede decir sin ver al paciente." (Bastardillas nuestras.)

No comprendemos cómo el juez sentenciador pudo llegar a la conclusión de que esa manifestación del doctor Morales es adversa a la existencia de un período de lucidez. Naturalmente, era imposible para el perito precisar el grado de lucidez sin tener ante sí al paciente, pero para él existía la presunción de que continuaba el período de lucidez de que gozaba Fuentes en la fecha que juró la solicitud para préstamo.

Manifiesta el juez, como hemos visto, que las declaraciones de los dos testigos instrumentales respecto a la conducta de Fuentes durante el otorgamiento de la escritura no tienen gran peso para él, toda vez que el doctor Sifre había declarado que una persona que sufre de paresis puede dar la impresión por sus actos y conducta de estar en un período de lucidez sin estarlo. Aceptamos la posibilidad de que los testigos instrumentales pudieran haberse equivocado al apreciar como lúcido el estado de demencia de Fuentes. Pero el errar es humano. Aún los mismos priquiatras difieren en sus opiniones con respecto a la demencia o sanidad mental de un paciente. Si fuéramos a aceptar el criterio del juez sobre este extremo, nunca podría probarse la existencia de un período de lucidez, pues siempre cabría la posibilidad de error. Precisamente teniendo en cuenta la flaqueza de la naturaleza humana prescribe el artículo 4 de la Ley de Evidencia:

"La ley no exige aquel grado de prueba *que, excluyendo la posibilidad de error, produzca absoluta certeza;* porque tal prueba es rara vez posible. Sólo se exige la certeza moral, o un grado de prueba que produzca convicción en un ánimo no prevenido." (Bastardillas nuestras.)

El juez sentenciador concluye que admitiendo que el demandado hubiere establecido prima facie que Fuentes gozaba de lucidez mental cuando otorgó el pagaré y la escritura de hipoteca, la prueba de los demandantes "al efecto de que el estado de locura de Abdón Fuentes fué continuo y persistente desde 1921 a 1928, en que murió, destruyó el efecto de la presunción." Esta conclusión es inconsistente con aquella parte de la opinión del juez sentenciador que dice, "En el caso específico de Abdón Fuentes el período de remisión más largo, *de acuerdo con la prueba,* fué de nueve meses." (Bastardillas nuestras.) También es inconsistente con aquella otra parte de la opinión que admite que Fuentes tuvo otro período de remisión que comenzó allá por el 19 de abril de 1923, o sea a partir de la fecha de la rehabilitación. Pero prescindiendo de estas inconsistencias, nos encontramos con que la prueba de los demandantes sobre este extremo, a la cual da crédito la corte sentenciadora, consistió de las declaraciones de las demandantes Francisca y Manuela Fuentes y de la de Domingo Antonio Hernández, yerno de Fuentes. Estos testigos relataron sus observaciones en relación con la forma de Fuentes comportarse en su vida diaria desde el 1921 hasta su muerte, y dijeron que nunca había tenido períodos lúcidos. Si el juez creyó las declaraciones de los peritos, tanto de los demandantes como del demandado, al efecto de que la enfermedad de que padecía Fuentes se caracteriza por sus períodos lúcidos; si creyó la declaración del doctor Ramírez, testigo de los propios demandantes, con respecto a los períodos lúcidos que había observado en Fuentes en distintas fechas desde su salida del manicomio por segunda vez el 9 de septiembre de 1922 hasta la fecha de su muerte; si el propio juez en el curso de su opinión mani-

212

fiesta que hubo un período lúcido que se extendió desde que Fuentes salió por primera vez del manicomio hasta que reingresó en la segunda ocasión; si admite la existencia de la resolución de la corte de distrito declarando rehabilitado a Fuentes, ¿cómo es posible dar crédito a esos tres testigos de los demandantes que aseguran que Fuentes nunca gozó de períodos lúcidos? Evidentemente una prueba tan terminante como ésta, especialmente la resolución de rehabilitación, no puede ser destruída por la mera declaración de los tres testigos antes mencionados.

Lo expuesto nos lleva a la conclusión de que el juez de la corte inferior erró al declarar que cuando Fuentes otorgó el pagaré y la escritura de hipoteca no se hallaba en un período lúcido y al anular en su consecuencia el contrato.

Pasemos a considerar la segunda cuestión, es decir, si el hecho de Carmen Fuentes hallarse demente al ser requerida de pago en el procedimiento ejecutivo hipotecario, lo anula.

Los demandantes satisfactoriamente probaron que Carmen Fuentes se hallaba demente cuando fué requerida de pago en el procedimiento ejecutivo. Empero, ella nunca fué judicialmente declarada incapaz. Siendo ello así, la notificación del requerimiento de pago no se rige por el inciso 4 del artículo 93 del Código de Enjuiciamiento Civil, que se limita a prescribir la forma de citar a un demente que ha sido judicialmente declarado incapaz. Pero como no existe ninguna ley especial que prescriba el procedimiento para citar a un demente que no ha sido declarado incapaz, el requerimiento de pago debe hacerse siguiendo hasta donde fuere posible la forma ordinaria prescrita por el inciso 6 del mismo artículo 93, que fué la seguida en el presente caso. El requerimiento así hecho es válido y suficiente para conferir jurisdicción a la corte, y por consiguiente no vició de nulidad el procedimiento ejecutivo. *Subirana* v. *Cortada,* 38 D.P.R. 204; *Olivera* v. *Grace* (Cal., 1942), 122 P. (2d) 564, 140 A.L.R. 1328, y autoridades citadas.

En los Estados Unidos las cortes de equidad, si bien sostienen que el emplazamiento o citación hecho a un demente que no ha sido declarado incapaz no es nulo ni siquiera anulable, conceden un remedio al demente dejando sin efecto la sentencia cuando ha existido fraude o cuando el demandante ha obtenido una indebida ventaja sobre el demente o la sentencia resulte injusta o contraria a la equidad. Pero por lo regular las cortes de equidad no intervienen a menos que el demente demuestre que tiene una defensa en los méritos o que en caso de dejarse sin efecto la sentencia y darle una oportunidad de ser oído la sentencia dictada sería distinta. Monografías en 34 A.L.R. 221, 140 A.L.R. 1336.

En el presente caso el banco no tomó ninguna ventaja indebida contra la demente. La deuda reclamada era legítima y la adjudicación de la finca al banco por la cantidad de seis mil dólares no causó a ella perjuicio alguno, toda vez que el propio juez sentenciador en este caso declaró que la finca al tiempo de ser adjudicada en el procedimiento ejecutivo tenía un valor de seis mil dólares. Además, el banco, luego de gestionar la venta de la finca por algún tiempo, no pudo obtener un precio más alto que el que pagó José Manuel Medina el 25 de marzo de 1938, o sea cuatro mil cien dólares.

*Procede por lo expuesto revocar la sentencia apelada y dictar en su lugar otra declarando sin lugar la demanda, con costas a los demandantes.*