Luz Porrata Doria y Veve, representada por su tutor Miguel A. Barasorda, sustituído por Jorge J. Serrallés, demandante y recurrente, *v.* The Fajardo Sugar Company of Puerto Rico y Fajardo Sugar Company, demandados y recurridos.

*Número:* 12116.  *Resuelto:* 7 de mayo de 1962.

*Rafael Pastor* y *José A. Luiña,* abogados de la recurrente; *Gonzalo Sifre,* abogado de los recurridos.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Rigau y Dávila.

PER CURIAM: La demandante, Luz Porrata Doria y Veve fue declarada incapacitada para la administración de sus

bienes y para regir su persona el 8 de mayo de 1930. Augusto O. Márquez y su esposo, fue designado tutor. "Por resolución de 18 de octubre de 1940 la Corte de Distrito de San Juan ordenó y decretó "que por razón de la completa curación de doña Luz Delia Silva Porrata Doria y Veve, ésta se encuentra capacitada para regir su persona y administrar sus bienes y por tal razón la rehabilita en todos sus derechos civiles y . Se declara terminada la tutela que venía desempeñando el peticionario don Augusto O. Márquez, esposo de la interesada, y habiendo ella aprobado las cuentas de tutela y otorgando carta de pago y finiquito de cuenta a su citado esposo y tutor la corte ordena la cancelación de la fianza prestada por él en garantía del cumplimiento de su cargo". Por escritura número 220 de 16 de noviembre de 1940 otorgada ante el notario Francisco Rebollo López, Luz Porrata Doria dio y confirió poder tan amplio y bastante cuando en derecho se requiera y fuere menester a su mencionado esposo.

La demandante y dos hermanas poseían en común proindiviso una finca dedicada al cultivo de cañas dulces. La Fajardo Sugar,[1] demandada en este pleito, las refaccionaba y como consecuencia de esta relación pagaba las contribuciones sobre la propiedad. En cierta ocasión la Fajardo no satisfizo las contribuciones y cuando la finca fué vendida en subasta para cobrar las contribuciones atrasadas, la Fajardo la adquirió. Las hermanas Porrata Doria, instaron pleito contra la Fajardo Sugar a base de que la Fajardo tenía la obligación de pagar las contribuciones. Se dictó sentencia a su favor. En apelación confirmamos. *Porrata* v. *Fajardo Sugar Co. of P. R.*, 57 D.P.R. 628 (1940).

La Fajardo Sugar Co. recurrió para ante la Corte de Apelaciones para el Primer Circuito federal. Estando pendiente el recurso de apelación, las hermanas Porrata Doria y la Fajardo Sugar convinieron en transigir todas las cues-

[1] Dos entidades fueron demandadas, pero nos referiremos a ellas como la Fajardo Sugar.

tiones que tenían pendientes y como consecuencia la Fajardo desistiría de su recurso. Como apoderado de su esposa y de las otras dos hermanas Porrata Doria, Augusto O. Márquez firmó el convenio transaccional. La Fajardo la representó John Bass. El convenio fue firmado en Nueva York el 28 de octubre de 1941. Este convenio fue elevado a escritura pública en Puerto Rico el 1ro. de diciembre de 1941. Augusto O. Márquez volvió a comparecer como apoderado de su esposa y de sus hermanas.

En septiembre de 1945, Luz Porrata Doria presentó una petición de quiebra voluntaria ante la Corte de Distrito Federal, para el Distrito de Puerto Rico, que fue jurada por la propia peticionaria ante el notario Enrique Igaravídez. En diciembre de 1946, radica por conducto de abogado y en unión de sus dos hermanas un pleito en la Corte de Distrito de Humacao contra la Puerto Rico Production Credit Association.

Transcurrieron nueve años desde que se firmó el convenio transaccional. El 3 de enero de 1951, la Corte de Distrito de Humacao, a solicitud de Augusto O. Márquez, dictó resolución declarando a Luz Porrata Doria incapacitada para regir su persona y sus bienes y designó tutor a Miguel Angel Barasorda.

El 24 de agosto de 1953 radica Miguel Angel Barasorda el presente pleito contra la Fajardo Sugar. El 20 de julio se radica demanda enmendada. La súplica de la demanda lee así:

"1.—Que declare inexistentes y nulo el documento de transacción suscrito a nombre de la demandante y Fajardo en la Ciudad de New York en el año 1941;

2.—Que declare nula e inexistente la hipoteca otorgada a nombre de la demandante a favor de Fajardo, según escritura número 101 de 1 de diciembre de 1941 ante Don Raúl Benedicto;

3.—Que ordene a Fajardo a contabilizar los ingresos y beneficios recibidos por ésta y por sus accionistas, y a contabilizar todos los ingresos producidos por la finca durante los años en que estuvo en posesión ilegalmente detentada por Fajardo

Sugar Growers Assn., en confabulación con Fajardo y para beneficio de ésta y de sus accionistas;

4.—Que declare y decrete que de haberse dedicado la finca en cuestión a su mejor uso durante los años en que estuvo en posesión ilegal de ella que la referida finca hubiera producido una cantidad en exceso de $600,000 de cuya cantidad corresponde a la demandante una tercera parte;

5.—Que en la alternativa se condene a las demandadas a pagar a la demandante por concepto de daños y perjuicios una suma igual a ⅓ parte de lo que hubiese producido la propiedad de que se trata durante los años en que su posesión estuvo ilegalmente detentada, cuya cantidad estima la demandante en más de $200,000.;

6.—Decretando y estableciendo que los beneficios devengados por Fajardo de su posesión ilegal han redundado en beneficio directo de Fajardo Sugar Company y en su injusto enriquecimiento, habiendo tenido ésta conocimiento de los hechos aquí narrados desde la fecha de su organización;

7.—Que se conceda a la demandante cualquier otro remedio en ley a que pueda tener derecho bajo los hechos expuestos con costas, y honorarios de abogado."

El tribunal de instancia declaró sin lugar la demanda. Sostuvo que "la declaración de rehabilitación judicial establece la presunción de capacidad de la demandante y no fue destruida por prueba merecedora de crédito y más bien afirmada [sic] por abundante prueba pericial y testifical", y continuó así: "[p]ara que sean nulos los documentos de transacción es necesario que la demandante estuviese mentalmente incapacitada para las fechas en que fueron estos otorgados. Entiende el Tribunal, y así lo declara, que dichos documentos son válidos y obligatorios para la demandante . . .".

La demandante, para sostener su recurso ataca la validez de la resolución dictada por la Corte de Distrito de San Juan con fecha 18 de octubre de 1946 que rehabilitó a la demandante en todos sus derechos civiles y declaró terminada la tutela iniciada en el año 1930. Funda su ataque en que la Corte de Distrito de San Juan actuó sin jurisdicción al de-

clarar terminada la incapacidad de la demandante. Sostiene que eso es así porque "el Tribunal que dictó la resolución de octubre 18 de 1940, sabía o debió saber—tenía conocimiento judicial o debió tenerlo—de que remisión o curación de los síntomas de un maníaco depresivo que ya el Tribunal sabía que había estado recluido en varias ocasiones anteriores en el Manicomio, no es equivalente a *curación* de esa enfermedad, ni en Ley ni en Siquiatría". Aparte del hecho de que esa cuestión no le fue planteada al tribunal sentenciador y que "[c]ontra los autos que pongan término al expediente de incapacidad podrían los interesados deducir demanda ordinaria por el procedimiento del juicio oral y público", Código Civil art. 185—31 L.P.R.A. sec. 708—, pleito que no se instó por los interesados, la realidad es que su posición no es correcta. El propio perito de la demandante Dr. Troyano de los Ríos afirmó que cuando una persona sufre de sicosis maníaco-depresiva puede en los períodos de remisión comprender la naturaleza de ciertos actos. Al doctor Troyano se le pregunta:

"P. ¿El hecho de que una persona padezca por un número de años de psicosis maníaco-depresiva quiere decir que esa persona ha estado durante todo ese período incapacitada?

R. No. Todo ese tiempo no.

P. ¿Continuamente no ha estado incapacitada?

R. No . . . Si ha habido remisiones no estaba incapacitada.

P. ¿Doctor, usted habló de episodios psicóticos que dejan residuos, no de episodios que pueden dejar residuos, verdad, y yo quisiera saber si el hecho de que un episodio deje algún residuo quiere decir que esa persona ha quedado incapacitada para los actos de su vida civil?

R. No señor."

El doctor Roselló, perito de las demandadas, prestó testimonio en la forma siguiente:

"P. ¿Si en su opinión es característica de la psicosis maníaco depresiva el que un paciente tiene remisiones en que se reintegra a la normalidad?

R. Sí. Esto está escrito en muchos textos de psiquiatría, los cuales dicen que después de un ataque y a veces de muchos ataques de psicosis maníaco depresiva el individuo después casi siempre no acusa ningún defecto en su intelecto, afectividad y juicio.

.   .   .   .   .   .   .   .   .

P. Una persona que sufre de episodios psicósicos como los récords de esta señora demuestran, cuando está en remisión, ¿goza de capacidad mental suficiente para darse cuenta de los actos civiles, legalizar contratos, vivir en sociedad, etc.?

R. Si está en remisión, sí está competente.

.   .   .   .   .   .   .   .   .

P. Doctor, una persona que sufre una condición maníaco depresiva tipo maníaco, ¿puede dar la impresión de estar normal sin estarlo?

R. Sería muy difícil, ya que la condición del estado maníaco es algo que cualquier individuo sin saber medicina o psiquiatría lo puede decir, porque es precisamente el cuadro que le trae a la gente lo que significa un estado de locura, o sea que es inconfundible.

.   .   .   .   .   .   .   .   .

R. En un estado maníaco yo digo que no puede puesto que el individuo no tiene ningún control sobre sus emociones y por lo tanto no podría simular estar tranquilo estando dentro de una etapa maníaca".

El doctor Massanet fue el especialista que declaró en la vista del caso sobre determinación de incapacidad.

"P. ¿Usted considera que la condición mental de esta señora . . .

R. Está perfectamente capacitada.

P. ¿Para regir su persona y administrar sus bienes?

R. Sí señor. Yo le sugerí que ella estuviese presente aquí en la Corte . . .

Abogado: Ella está aquí en la Corte."

La demandante fue a otorgar la escritura de poder ante el notario Rebollo López en Fajardo. La describe así el notario:

"Bueno . . . Doña Luz se comportaba como una persona completamente normal. Es más, yo ignoraba que hubiese es-

tado enferma alguna vez. Su comportamiento fue completamente normal; completamente razonable. Contestó todas mis preguntas no hizo ningún gesto que me hubiese llevado al ánimo de que ella estuviese padeciendo de enfermedad mental."

En *Fuentes* v. *Federal Land Bank*, 64 D.P.R. 199, 203 (1944) donde se trataba de una persona que contrató en un período de remisión, dijimos:

"Pero como de conformidad con el [art.] 1214 el consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato, es en el instante en que tiene lugar ese concierto de voluntades cuando debe existir la capacidad para prestar consentimiento."

Al mismo efecto: *Rivera* v. *Sucn. Díaz Luzunaris*, 70 D.P.R. 181, 188 (1949) donde dijimos que:

"El contratante puede ser un loco desde el punto de vista del psiquiatra, y no obstante, tener la capacidad mental suficiente para darse cuenta del alcance de una determinada transacción."

El tribunal de instancia al resolver el presente caso se expresó así:

"Si tomamos en consideración que la demandante ha estado en varias ocasiones en remisión de síntomas; que fue rehabilitada por el Tribunal a solicitud de su esposo el día 18 de octubre de 1940; que otorgó un poder a favor de su esposo el día 16 de noviembre de 1940 y haciendo uso de este poder su esposo otorgó los documentos que ahora se pretenden anular; que fue dada de alta en remisión de síntomas el día 27 de agosto de 1940 y que su esposo tenía oportunidad de conocer la conducta de su esposa para saber si debía actuar como mandatario o en virtud de autorización judicial para hacer la transacción de los pleitos, necesariamente tenemos que concluir que la demandante estaba con capacidad suficiente para la fecha en que otorgó el poder y se realizó la transacción. Resolver otra cosa sería concluir que todo lo actuado por su mandatario fue de mala fe para destruir el derecho de las demandadas a continuar su apelación, y de mala fe fue tanto la declaración de rehabilitación .para actuar en su nombre y representación en los documentos de transacción como la última declaración de incapacidad para iniciar esta acción."

Estamos convencidos que la prueba claramente revela que la demandante cuando otorgó el poder a su esposo estaba en el pleno ejercicio de su capacidad para obligarse. La prueba pericial y testifical así lo revela. Nada hay en la prueba que demuestre que no lo estaba cuando se firmó el contrato transaccional el 28 de octubre de 1941 ni cuando su esposo como apoderado suyo y de sus hermanas compareció para ratificar lo acordado entre las partes. Es de importancia apuntar que luego de las fechas en que se otorgó el poder y se convino la transacción con las demandadas, la aquí demandante compareció en corte en dos ocasiones representando sus propios intereses. Nada hay en la prueba que justifique alterar la conclusión del tribunal sentenciador.

*Se confirmará la sentencia que dictó el Tribunal Superior, Sala de San Juan, con fecha 25 de enero de 1955.*