JOSEFA RIVERA, demandante y apelada, *v.* SUCESIÓN DE IGNACIO DÍAZ LUZUNARIS, ETC., demandados y apelantes.

Núm. 9799.—*Sometido:* Febrero 1, 1949. *Resuelto:* Julio 5, 1949.

*M. Rivera de la Vega y R. V. Pérez Marchand,* abogados de los ape-
lantes; *E. T. Fiddler, José G. González, Tomás I. Nido, Jorge
M. Morales, Ramón L. Nevares, Mario Canales y Andrés Guille-
mard,* abogados de la apelada.

EL JUEZ PRESIDENTE SEÑOR DE JESÚS emitió la opinión del tri-
bunal.

Ramón Pastor Díaz Molinari a su fallecimiento el 4 de
noviembre de 1939, dejó un capital calculado en $600,000.
Sus únicos y universales herederos fueron su hijo legítimo
Ignacio Díaz Luzunaris, su hijo natural reconocido Ramón
Díaz Rivera[1] y su viuda Eustacia Luciano Maldonado. Por
escritura de 28 de febrero de 1940 ante el notario Adolfo
Porrata Doria, el hijo natural celebró con su hermano un

---

[1] El hijo natural fué reconocido por sentencia dictada contra la Sucesión
de Ramón Pastor Díaz Molinari el 28 de febrero de 1940.

contrato de transacción de derechos hereditarios a virtud del cual sólo recibió la cantidad de $10,000 en pago total de su participación en la herencia de su padre. Para anular esa transacción, Ramón Díaz Rivera, previamente declarado incapaz para administrar sus bienes por razón de locura, representado por su tutora, su madre Josefa Rivera, instó este pleito contra Ignacio Díaz Luzunaris,[2] el 26 de enero de 1945. Basó su causa de acción en que al tiempo de celebrarse el referido contrato estaba padeciendo de enajenación mental y por ese motivo no tenía capacidad para prestar el consentimiento que para la existencia de todo contrato requiere el artículo 1213 del Código Civil.[3]

En su contestación negó el demandado la incapacidad mental del demandante. Alegó que la demanda no aducía hechos constitutivos de causa de acción; que el demandante estaba impedido de invocar su incapacidad porque en la acción de filiación, en la cual se dictó sentencia a su favor el mismo día en que fueron transigidos los derechos hereditarios, el demandante compareció sin estar representado por tutor, lo que según el demandado lo indujo a creer que estaba capacitado para contratar. Por último se alegó que la acción había prescrito, por cuanto al tiempo de radicarse la demanda de este pleito, habían transcurrido más de cuatro años desde la consumación del contrato de transacción.

La corte inferior escribió una extensa opinión en la que desestima todas las defensas interpuestas por el demandado;

[2] El pleito se dirigió contra Ignacio Díaz Luzunaris y contra la viuda de Pastor Díaz Molinari. En cuanto a la viuda, solicitaba se declarase nulo un contrato celebrado entre ella e Ignacio Díaz Luzunaris con posterioridad a la transacción entre los dos hermanos y por el cual Ignacio Díaz Luzunaris transigió con la viuda los derechos que ella tenía en la herencia de su esposo. En cuanto a este contrato, la corte desestimó la demanda y la sentencia no fué apelada, por lo que es innecesario hacer más referencia al mismo.

[3] El artículo 1213 del Código Civil, en lo pertinente, prescribe:

"Artículo 1213.—No hay contrato sino cuando concurren los requisitos siguientes:

"1. Consentimiento de los contratantes.

"2. . . . . . . . . . ."

hace un resumen de la declaración de cada testigo de una y otra parte, y luego pasa a exponer sus conclusiones de hecho, para llegar entonces a la conclusión de que el consentimiento prestado por el demandante estaba viciado por la influencia indebida que ciertas personas, entre ellas su propio abogado, habían ejercido sobre él, que era un débil mental. Por ese fundamento declaró inexistente el contrato de transacción de derechos hereditarios, y en consecuencia, dictó sentencia a favor del demandante.(⁴)

No podemos convenir con la corte inferior en que el contrato es inexistente por el fundamento de que el mismo fuera obtenido mediante "influencia indebida". La doctrina de influencia indebida de la Ley Común, con una variante que discutiremos más adelante, está comprendida en la más abarcadora del dolo del Derecho Civil, consagrada en el artículo 1221 del Código Civil en los siguientes términos:

"Art. 1221.—Hay dolo cuando con palabras o maquinaciones insidiosas *de parte de uno de los contratantes,* es inducido el otro a celebrar un contrato que sin ellas no hubiera hecho." (Bastardillas nuestras.)

Comentando Manresa el artículo 1269 del Código Civil Español, igual al 1221 del nuestro, y refiriéndose al dolo causante,(⁵) dice:

"La esencia de esta especie de dolo se encuentra en el engaño que obtiene un consentimiento del engañado, arrancándolo, o a lo

---

(⁴)Antes de la celebración del juicio en la corte inferior, falleció Ignacio Díaz Luzunaris, siendo sustituído por su Sucesión, compuesta de sus hijos legítimos menores de edad y de su viuda Eva Lamoutte, quienes instaron el presente recurso de apelación.

Después de establecida la apelación falleció el apelado Ramón Díaz Rivera, habiendo sido sustituído por su madre natural Josefa Rivera.

(⁵)Los tratadistas y aun el propio Código (artículo 1222, ed. 1930) distinguen dos especies de dolo: el causante o grave y el incidental. El primero, es aquel que determina el consentimiento y por supuesto, causa la nulidad de la obligación; el segundo, el incidental, también llamado dolo incidente, no anula el contrato porque no es grave y sólo da lugar a la indemnización de daños y perjuicios. Manresa, Comentarios al Código Civil Español, t. 8 (2da. ed. 1907) pág. 658.

menos influyendo en él. Esto quieren indicar las palabras 'o maquinaciones insidiosas', a que se refiere la ley, las cuales comprenden las falsas promesas, la exageración de esperanzas o beneficios, *el abuso de la confianza*, la ficción de nombre, cualidades *o poder*, las mil formas, en suma, del engaño, que pueden alucinar a un contratante, produciendo un consentimiento viciado, . . . ''. Manresa, Comentarios al Código Civil Español, t. 8 (2da. ed. 1907) pág. 657. (Bastardillas nuestras.)

Compárese ahora el dolo del Derecho Civil con la ''influencia indebida'', según la define II *Restatement of the Law of Contracts*, sec. 497, pág. 954 *et seq.*:

''Cuando una parte se halla bajo el dominio de otra o cuando por virtud de la relación existente entre ellas una está justificada en asumir que la otra no actuará en forma inconsistente con su bienestar, una transacción inducida por injusta persuasión de la última, ha sido inducida por influencia indebida y es anulable.''

Bastará leer el comentario de Manresa para advertir que la frase ''o maquinaciones insidiosas'' con el significado que tiene en el Derecho Civil Español, comprende la indebida influencia de la Ley Común.

█ Consiste la variante que dijéramos antes, en que bajo el Derecho Civil, cuando el dolo procede de una persona que no es parte o no actúa con la complicidad o al menos con el conocimiento sin protesta del contratante favorecido, el contrato es perfectamente válido. Naturalmente, el contratante perjudicado tiene una causa de acción por los daños sufridos contra el tercero que lo engañó. Esta doctrina descansa en que en tal caso las dos partes contratantes proceden de buena fe y no hay motivo para imponer a una de ellas las consecuencias de lo hecho por un tercero, en el cual depositara imprudentemente confianza el otro contratante. No obstante, dice Manresa, el dolo causado por un tercero puede producir la nulidad del contrato, cuando ese dolo produzca error en el contratante que lo sufre. En tal caso, no es el dolo, sino el error el que vicia el consentimiento. Manresa, ob. y t. citados, pág. 854. Pero ya se vicie el consen

timiento por dolo o por error, el contrato es meramente anulable. En cambio, bajo la Ley Común, la influencia indebida, a pesar de que sea causada por un tercero que en nada se beneficie con el contrato, vicia el consentimiento aunque sea sin la complicidad o el conocimiento del contratante favorecido. Véase Monografía en 96 A.L.R. 613.

██ Pero nuestra discrepancia no se reduce a una cuestión de semántica. Ya adoptemos el nombre de la doctrina de la Ley Común, ya usemos la denominación que a esa doctrina corresponde en Derecho Civil, es lo cierto que bajo nuestro Código Civil, cuando existe dolo, el contrato no es inexistente, sino anulable y la acción para reclamar su nulidad prescribe a los cuatro años de la consumación del contrato, conforme dispone el artículo 1253 del Código Civil. De manera, pues, que si sostuviéramos la conclusión a que llegó la corte inferior de que el contrato es inexistente por haber mediado influencia indebida, que es una de las varias modalidades del dolo definido en el artículo 1221 del Código Civil,(⁶) tendríamos que revocar la sentencia y desestimar la demanda porque al ser ésta radicada habían transcurrido más de cuatro años desde la consumación del contrato, y por el fundamento adicional de que la corte no declaró probado que la persona que ejercitó la indebida influencia, hubiera actuado con el conocimiento o la complicidad del demandado.

██ En el presente caso ya hemos visto y así lo declaró probado la corte inferior, que la causa del contrato es "irrisoria".(⁷) Claro es que el hecho aislado de que la causa de un contrato sea extremadamente inadecuada no es por sí solo suficiente evidencia de que el perjudicado careciera de la capacidad mental necesaria para prestar el consentimiento, requisito indispensable para la existencia de los contratos.

---

(⁶)El dolo comprende el engaño, el fraude, la falsa representación, la indebida influencia con la limitación antes expuesta.

(⁷)El propio demandado, al presentar la planilla de contribución de herencia, consignó que al demandante había correspondido, por concepto de herencia, la cantidad de $76,053.21.

Pero no cabe duda de que una causa extremadamente inade-
cuada es un indicio bastante fuerte que debe mover al Tri-
bunal a examinar las condiciones del contratante perjudicado
para determinar si en efecto se trata de una persona men-
talmente incapacitada como se alega en la demanda de este
caso.

■■ Parece conveniente antes de emprender el estudio
de la evidencia, establecer cuál es el criterio legal para deter-
minar si ha existido consentimiento válido. El artículo 1215
del Código Civil prescribe que no pueden prestar consenti-
miento los locos o dementes. Cabe preguntar ahora: ¿el loco
o demente a que se refiere el artículo 1215 es acaso única-
mente el loco desde el punto de vista del psiquiatra como
entendió la corte inferior? No es ese el criterio para deter-
minar la capacidad para contratar. La norma a seguir en
casos civiles es determinar si el contratante, enfermo men-
tal por razón de su enfermedad, goza de capacidad mental
suficiente para darse cuenta de la transacción específica que
realiza, considerándola en todos sus aspectos. El contra-
tante puede ser un loco desde el punto de vista del psiquia-
tra, y no obstante, tener la capacidad mental suficiente para
darse cuenta del alcance de una determinada transacción. De
ahí que el artículo 180 del Código Civil, al tratar de la tutela
de los locos, preceptúe que no se podrá nombrar tutor a los
locos o dementes mayores de edad, sin que preceda la decla-
ración de que son incapaces para administrar sus bienes.
Esto lógicamente implica que al loco que está capacitado para
administrar sus bienes no se le puede nombrar tutor. Si
la ley prohibe que se le nombre tutor a la persona que tiene
capacidad para administrar sus bienes, precisa concluir que
eso es así porque le reconoce la capacidad legal para contra-
tar. Por esta razón dice Manresa, comentando el artículo
213 del Código Civil Español igual al 180 del nuestro:

"La prevención que hace este artículo es perfectamente lógica.
Lo primero que hay que probar es la procedencia de la tutela, y

ésta claro es, que no resulta necesaria mientras la locura, la demencia o la sordomudez *no sean tales que incapaciten al paciente para administrar,* debiendo esta circunstancia acreditarse legalmente.'" Tomo 2 (3ra. ed. 1907) págs. 203–4.

Y al mismo efecto dice Scaevola:

"Lo mismo cabe sostener del loco que no es furioso, . . . de aquel monomaníaco templado en su conducta, buen administrador de sus bienes, y que sólo se desvía del común pensar y sentir cuando la manía ejerce su influjo sobre su pensamiento. ¿Qué motivo hay para someter a esta persona a perpetua tutela cuando es capaz de administrar? A buen seguro que los parientes a quienes la ley reconoce facultad de pedir la declaración de incapacidad, si notasen que dilapidaba sus bienes o abandonaba al descuido sus heredades, pudiéndose atribuir a su locura, ya ejercitarían sus derechos.

"*La declaración judicial de la demencia lleva consigo tan trascendentales efectos que siempre se ha requerido una previa información ante los Tribunales, de la que resultase la prueba plena de la incapacidad.*" Scaevola, Código Civil Español, t. 4 (3ra. ed. 1893) pág. 222. (Bastardillas nuestras.)

Abundando Manresa en ese criterio, al comentar el artículo 1263 del Código Civil Español, igual al 1215 del nuestro, sostiene que el contrato celebrado por un niño, no es meramente anulable, sino inexistente porque su escaso desarrollo mental no le permite darse cuenta de la transacción que celebra. Y cita con aprobación la Sentencia del Tribunal Supremo de España de 6 de noviembre de 1858, donde se resolvió que no se infringe la ley declarando nulo un contrato celebrado por una persona en estado de embriaguez. Comentando esa sentencia que califica de importantísima, expone:

"Nada dice el Código sobre este particular, pero como nada decía tampoco la legislación antigua, a pesar de lo cual se formuló la doctrina, y como son permanentes los fundamentos de justicia que abonan ésta, creemos que, planteado el caso, se resolvería de igual modo, y más aún, teniendo en cuenta que el silencio de la ley puede explicarse por la conveniencia de no dar una regla inflexible para el hecho de tan varia gradación e influencia como la embriaguez.

Porque, eso sí, habrá de distinguirse atendiendo siempre a las condiciones del sujeto, desde las libaciones, que no privan de la razón sin efecto anulatorio alguno, hasta aquellos últimos grados de la embriaguez que oscurecen por completo las facultades y casi extinguen la conciencia de los actos, reservando para estos últimos la nulidad de las obligaciones así contraídas.'' Ob. y t. citados, pág. 641.

De modo, pues, que si Ramón Díaz Rivera, por razón de su enfermedad—que como veremos más adelante databa desde temprana edad—tenía sus facultades mentales tan obscurecidas que le impedían darse cuenta de la transacción tan importante que estaba celebrando, fuerza es concluir, aplicando la doctrina enunciada, que el consentimiento que él prestó fué el mismo que hubiera prestado un individuo cuya mente estuviera obscurecida por la embriaguez o por su falta de desarrollo debido a su corta edad.

El mismo critério se aplica en la Ley Común. El artículo de Milton D. Green, titulado ''Proof of Mental Incompetency and the Unexpressed Major Premise'', publicado en 53 The Yale Law Journal, págs. 271, 275, dice:

''El hecho determinante a ser probado es incompetencia mental —*no locura*. Desde el punto de vista legal, *esa locura o demencia es indiferente, es decir, no es un factor determinante. Como un hecho probado, la locura puede dar lugar a una inferencia de incompetencia mental, dependiendo en cada caso del tipo o severidad de la enfermedad mental; pero está bien establecido que la mera prueba de debilidad mental o locura no basta para inválidar un contrato o un testamento.* Para que exista incompetencia mental el desorden de la mente debe ser tal que destruya la capacidad para entender la transacción particular de que se trate.'' (Bastardillas nuestras.)

Conocido ya el criterio aplicable, examinemos ahora los hechos que la corte estimó probados y determinemos si demuestran que la capacidad mental del demandante era suficiente para darse cuenta de la importante transacción que celebró con su hermano.

La corte inferior declaró probados:

1. Que allá para el año 1938 el Dr. Rafael Muñoz Vázquez examinó al demandante a petición de su madre Josefa Rivera, a fin de poder ingresarlo en el Manicomio Insular; que como resultado de la información que ella le diera sobre su hijo y las preguntas que a éste hiciera, llegó a la conclusión de que el estado del demandante dependía de sífilis cerebral; que notó en él síntomas de esquizofrenia y de los de un hombre que podía estar enajenado de sus facultades mentales.

2. Que el demandante una vez se rompió toda la ropa y se quedó desnudo y en otra ocasión compró una yegüita y trató de enseñarla a vivir sin comer; que con dinero que recibió de la transacción empezó a comprar automóviles y luego quería destruirlos con una segueta; que compró una motocicleta y estuvo corriendo en ella tres días con sus tres noches, vendiéndola luego en $300 a pesar de haberle costado $700; que iba al campo de aviación, montaba en aeroplanos y luego aseguraba que él mismo los había conducido; que era conocido con el mote de ''Popeye el loco''; que constantemente decía que cuando cogiera el importe de la herencia se compraría una motocicleta y un aeroplano; que el demandante transigió sus derechos hereditarios en la herencia de su padre por la suma de $10,000, de los cuales recibió $5,000 y los $5,000 restantes fueron a las manos de sus abogados.

3. Que conforme declaró el psiquiatra Dr. José R. Maymí, graduado de la Universidad de Johns Hopkins, el demandante padecía de oligofrenia, la cual es un grado deficiente de la inteligencia; que no era hombre competente; *que no era persona que pudiera entender el alcance de una transacción financiera que envolviera miles de dólares, ya que no podía aquilatar el verdadero valor del dinero y que ese estado databa en él de época muy temprana en su vida;* que el demandante tiene aproximadamente doce años de edad men-

tal, que viene siendo un cociente de setenta y cinco por ciento de inteligencia normal; que para el Ejército de los Estados Unidos se requiere una edad mental de doce años (⁸) y que Ramón Díaz Rivera es un imbécil de alto grado, llegando a los límites del morón, pero que no puede considerársele *loco psiquiátricamente;* que no estaba loco cuando se celebró el juicio, pero que lo había estado en dos ocasiones; que padecía de sífilis y dió positivo en el examen de Wasserman.

4. Dando crédito a la declaración del Dr. José D. Jiménez, la corte estimó probado que el demandante tenía una edad mental de doce años y un mes; que estaba entre el límite del retardado mental o torpe y el morón; que es un débil mental, persona muy emotiva y sensible a cualquier estímulo y además que era muy impresionable y no era persona culta. Admitió este testigo, según lo estimó probado la corte, que si antes de perder su dinero él compraba automóviles para convertirlos en aeroplanos, demostraba muy poco juicio y *presumiría que estaba mentalmente enfermo;* que en cuanto a lo del caballo vivir sin comer, diría que era una cosa completamente absurda, que se trataba de una persona completamente anormal; que el atacar a la madre violentamente demostraba anormalidad; que Ramón Díaz Rivera era una persona que respondía a impulsos, una persona precipitada y era inexacto en su memoria; que era su opinión *que él podía hacer decisiones con desventaja para él.*(⁹)

---

(⁸)En su declaración este perito manifestó que si hubiera ingresado Ramón Díaz Rivera en el Ejército lo hubieran licenciado en seguida.

(⁹)Conviene tener presente que el Dr. Jiménez, declarando como perito de los demandados, informó que en la prueba psicométrica a que sometió al demandante, resultó el notable defecto que tenía él para recordar los meses del año; que unas veces los recordaba bien y otras cometía errores, y cuando le preguntaba qué mes antecede a otro, contestaba casi siempre el mes siguiente; que su memoria era defectuosa, pero el perito de los demandados trató de explicar esta situación mental del demandante diciendo que a él le daba la impresión que el demandante no atendía a las preguntas porque no tenía interés en vivir hechos en su vida pasada; que las contestaciones que daba no eran siempre responsivas; que el demandante no daba muestra de fatiga mental ni de estar lento, sino más bien la tendencia de precipitarse en sus contestaciones; que sabe apreciar situaciones *a veces* complicadas, *pero no da la impre-*

5. Por otro lado estimó probado la corte que el demandante, mientras era muchacho, acostumbraba hacer mandados y merodear por los alrededores del cine de Guayama; que era un muchacho servicial que estuvo hasta segundo grado de escuela elemental y que luego de haber recibido el dinero de la transacción de su herencia, obtuvo licencia para conducir vehículos de motor en Puerto Rico, después de pasar varios exámenes escritos y prácticos ante el Negociado de Automóviles del Departamento del Interior. Esto no obstante, la corte estimó probado que el demandante estaba ansioso de obtener el dinero con el fundamental propósito de hacerse de un automóvil, una motocicleta o un aeroplano y que el día que precedió al de la transacción, sus abogados le facilitaron los medios de obtener una licencia para conducir vehículos de motor en esta Isla.

A nuestro juicio, el criterio aplicado por la corte es erróneo. La norma aplicada no debió ser si el demandante era un loco desde el punto de vista del psiquiatra. Es verdad que ningún testigo del demandante expresamente declaró que el día 28 de febrero de 1940, fecha en que se suscribió la escritura de transacción, él estuviera loco. Pero hemos visto por la evidencia presentada en este caso, tanto pericial como de personas que observaron la conducta de Ramón Díaz Rivera, que la corte estimó probado que su enfermedad mental era permanente y que su falta de capacidad existía en todo momento desde temprana edad. Entre los testigos del demandado que declararon sobre su capacidad mental en el momento de firmarse el contrato de transacción el 28 de febrero de 1940 se halla el Lic. Adolfo Porrata Doria. Este, como es natural, tenía marcado interés en sostener la capacidad mental del demandante para celebrar el contrato que se llevó a cabo bajo su consejo y del cual el testigo se benefició. La mejor refutación a su testimonio es el hecho estimado

___

sión de tener un profundo conocimiento de las materias envueltas; que el testigo diría que el demandante es una persona que sabe perfectamente una situación pero que no le gusta profundizarla ni analizarla.

probado por la corte que cuando se fué a celebrar el contrato de servicios profesionales en el caso de filiación, al abogado Porrata Doria no le satisfizo que dicho contrato fuera firmado por Ramón Díaz Rivera solamente, sino que exigió que su madre Josefa Rivera también lo firmara a pesar de que el demandante era entonces mayor de edad y de que su madre no tenía interés pecuniario en el resultado del pleito. A este efecto, cabe repetir la pregunta que se hizo la corte sentenciadora: "¿Por qué creyó necesario tomarle la firma a la madre de Díaz Rivera en ese contrato, a pesar de que él era ya mayor de edad? ¡Quién sabe si se conocía que Ramón era un incapaz, un débil mental!" Otro de los testigos presentes al firmarse la escritura, el abogado Ismael Anglade, nos dice que el demandante actuó como una persona normal, pero, sin embargo, declara que cuando se iba a firmar el contrato y el abogado Porrata Doria alegaba que $10,000 era una cantidad inadecuada, el propio demandante le interrumpió para decir que era suficiente. Ya sabemos lo inadecuada que resultó la compensación recibida por él, de manera, pues, que considerada la prueba que ya conocemos, esta actitud del demandante en aquellos momentos en que cualquier persona normal hubiera tratado de cooperar con su abogado para sacar el mejor partido, está demostrando que el demandante no estaba actuando, en aquel momento, como lo hubiera hecho una persona normal en defensa de sus intereses. A nuestro juicio, la corte inferior cometió manifiesto error al no declarar inexistente el contrato de transacción por falta de capacidad en el demandante para prestar consentimiento.

■ ■ Es conveniente consignar que la corte a quo declaró probado que la sentencia de filiación había sido obtenida a base de una transacción del estado civil. Basó su conclusión en que el 18 de enero de 1940 los dos hermanos habían suscrito un contrato a virtud del cual Díaz Luzunaris se obligaba a no poner obstáculos al pleito de filiación, y en que en el de transacción de derechos hereditarios celebrado el 28 de

febrero de 1940, se expuso también que la causa de la transacción era el pago de $10,000 por los derechos del hijo natural en la herencia, así como el no haberse puesto obstáculos al pleito de filiación. Al iniciar la discusión de este punto, no podemos perder de vista que la prohibición de transigir el estado civil es una limitación al derecho de libre contratación y como tal, debe ser estrictamente interpretada. *Ex parte Santiago et al y El Pueblo*, 21 D.P.R. 377. Es significativo que los propios apelados, los únicos perjudicados por la sentencia de filiación, señalen como error el haberse declarado que hubo tal transacción del estado civil. Sostienen que no la hubo y explicando su posición dicen en su alegato:

"Pero el hecho escueto en el caso de autos de que Ignacio Díaz no interpondría obstáculos o dificultades para que aquella corte dictara sentencia fué, y debe ser, considerado en derecho, una demostración de su acatamiento a la ley que rige la materia de filiación."(10)

En verdad la sentencia de filiación no fué dictada a virtud de la estipulación de las partes a ese efecto, sino que el demandante presentó su prueba, la corte la oyó, la apreció y por los méritos de la misma, dictó la sentencia. Es cierto que el demandado en el pleito de filiación no ofreció evidencia alguna y que en el contrainterrogatorio de los testigos del deman-

(10) Parece pertinente consignar que en 1911, cuando el demandante contaba tres años de edad, Josefa Rivera, en su carácter de madre con patria potestad, instó pleito de filiación contra Ramón Pastor Díaz Molinari, y el 12 de enero de 1912 obtuvo sentencia decretando la filiación. La sentencia fué revocada por este Tribunal y devuelto el caso para un nuevo juicio por el fundamento de que la corte inferior erró al no admitir cierta evidencia ofrecida por el demandado, al efecto de que la madre del demandante había tenido relaciones con otros hombres en la época en que el niño pudo ser concebido. *Rivera* v. *Díaz*, 19 D.P.R. 548. Por razones que desconocemos, el nuevo juicio no se celebró hasta el 28 de febrero de 1940. Pero en relación con la prueba ofrecida y no admitida en el primer juicio, es significativo que el 12 de diciembre de 1912, Ramón Pastor Díaz Molinari, Pedro G. Goyco y el abogado Luis Abella Blanco, quienes actuaban de mutuo acuerdo, fueron convictos por la Corte de Distrito de Guayama de un delito de conspiración y sentenciados a cumplir un año de cárcel. El delito consistió en que Ramón Pastor Díaz Molinari, puesto de acuerdo con Goyco y su abogado, mediante el pago de

dante se limitó a formular preguntas sin importancia alguna. ¿Acaso estaba el demandado obligado a oponerse a la demanda de filiación? Si en realidad no tenía probabilidades de éxito y estaba convencido del derecho que asistía al demandante, ¿no era más beneficioso para el demandado evitar una contienda inútil y tratar así de lograr una mejor transacción de los derechos hereditarios con el hijo natural? Nos parece que si la prueba que tuvo ante sí la corte—que nadie ha insinuado siquiera que fuera falsa—ameritaba la sentencia y la propia corte no sabía, como así resultó de los autos, que existiera tal convenio de 18 de enero de 1940 cuando la dictó, al así resolver no pudo ser influenciada por convenio anterior entre las partes, sino que actuó de acuerdo con la prueba presentada. Además, precisa tener en cuenta que el demandante estaba mentalmente incapacitado para celebrar un contrato, y siendo ello así, el supuestamente celebrado el 18 de enero de 1940 no es un arma que pueda esgrimirse en perjuicio de sus intereses y a favor de quien se benefició prevaliéndose de su incapacidad.

█ Otro error señalado por la apelante es el de que la corte inferior aceptara como válido el nombramiento de tutora a favor de Josefa Rivera, a virtud del cual presentó este pleito en representación de su hijo. Se impugnaba la tutela

$25 a un tal Ramón Jiménez, consiguió que éste, quien nunca había tenido relaciones de clase alguna con Josefa Rivera, se prestara a reconocer como hijo suyo en escritura pública a Ramón Díaz Rivera, siendo éste entonces un menor de edad. En la referida escritura comparecían Ramón Jiménez y Josefa Rivera y expusieron que habían procreado a Ramón Díaz Rivera. Esta escritura fué preparada por dicho abogado, de acuerdo con Ramón Pastor Díaz Molinari. Y prevaliéndose de que Josefa Rivera, aunque podía firmar no sabía leer ni escribir, la engañaron diciéndole que por aquella escritura Ramón Pastor Díaz Molinari le estaba reconociendo su hijo, todo lo cual se hizo con el fin de que ella la firmara y de ese modo privar al menor de su derecho a establecer su *status* como hijo natural reconocido de Ramón Pastor Díaz Molinari. Bajo ese engaño la madre firmó la escritura. Esa actuación combinada entre Ramón Pastor Díaz Molinari, Goyco y el referido abogado, fué la que dió lugar a la sentencia por conspiración, la cual fué confirmada por este Tribunal. *Pueblo* v. *Díaz et al*, 22 D.P.R. 191; *In re Abella*, 25 D.P.R. 744.

No es extraño, pues, que el demandado, conociendo estos antecedentes, no pusiera obstáculos a la filiación del demandante.

por los fundamentos de que el nombramiento no había sido inscrito en el libro de tutelas, porque el incapaz no fué legalmente notificado del procedimiento y porque el fiscal no compareció en defensa del alegado incapaz. Pero la corte a quo declaró probado que el incapaz estuvo presente durante la vista del caso y se dió cuenta del acto que se estaba allí realizando; que la ley no exige la presencia del fiscal como requisito indispensable para la validez del procedimiento y finalmente que la carta de tutela fué inscrita en el libro correspondiente. A nuestro juicio no erró la corte al sostener la validez del nombramiento de tutor.

██ ██ La contención de que la demanda no aduce hechos está basada en que en la misma no se alegó que el demandante estuviera dispuesto a restituir al demandado los $10,000 que recibió a virtud del contrato cuya nulidad solicitaba. Es verdad que el artículo 1255 del Código Civil exige que declarada la nulidad de una obligación, los contratantes deben restituirse recíprocamente las cosas que hubiesen sido materia del contrato con sus frutos, etc., y que el 1256 dispone que cuando la nulidad procede de la incapacidad de uno dè los contratantes no está obligado el incapaz a restituir, sino en cuanto se enriqueció con la cosa o precio que recibiera; pero es que como cuestión de hecho el demandado en todo momento debía al demandante, por concepto de su herencia, una cantidad mucho mayor que los $10,000 que éste recibió. De manera, pues, que ni aún después de dictada sentencia decretando la nulidad del contrato, vendría obligado el demandante a devolver cantidad alguna al demandado, y por el contrario, tendría derecho a recibir de éste el complemento de su legítima. Tampoco erró la corte al resolver que la acción no había prescrito. De acuerdo con la demanda y con la prueba, se trataba de un contrato inexistente por falta de consentimiento y la acción para decretar la inexistencia nunca prescribe.

Hay otros errores señalados por la apelante que en verdad son tan insubstanciales que no justifican su discusión. Entre

ellos podríamos señalar el de que el demandante ratificó la transacción de derechos hereditarios por el mero hecho de haber recibido los $10,000 en pago de su herencia.

*Aunque por fundamentos distintos de los expuestos por la corte inferior, procede la confirmación de la sentencia apelada.*([11])

El Juez Asociado Sr. Marrero no intervino.

Opinión concurrente del Juez Asociado Señor Snyder.

Convengo en que la prueba médica y la no pericial fué suficiente para sostener la conclusión de que Ramón Díaz estaba loco cuando otorgó la escritura de transacción. En su consecuencia, si la corte de distrito hubiera dictado sentencia a favor del demandante basada en una declaración de locura, yo votaría para confirmarla por ese motivo.([1]) Pero no puedo convenir en que la corte inferior cometió error manifiesto al no declarar loco a Ramón para esa fecha. Por el contrario, no puedo ver qué autoridad tenemos para decir que la corte de distrito venía obligada a rechazar la amplia prueba de que Ramón era un excéntrico, un estúpido y casi un morón más bien que un loco. Además, aun cuando pudiera decir que la corte de distrito cometió manifiesto error en la aprecia-

---

([11]) En vista de lo que aparece de los autos con respecto a la intervención del abogado Adolfo Porrata Doria, oportunamente se ordenará al Fiscal de este Tribunal que proceda a practicar una investigación con respecto a la conducta profesional de dicho abogado.

([1]) Véanse *Fuentes* v. *Federal Land Bank,* 64 D.P.R. 199; *Sucn. Gómez* v. *Colón,* 63 D.P.R. 104; *Valiente & Co.* v. *Sucn. Fuentes,* 45 D.P.R. 617, confirmado en 76 F.2d 78 (C.C.A. 1, 1935); *Sucesión Cabrera et al.* v. *Aponte,* 29 D.P.R. 938; *Caballero et al.* v. *Pomales et al.,* 17 D.P.R. 719. *Cf. Fisher* v. *United States,* 328 U.S. 463; *Wialua Co.* v. *Christian,* 305 U.S. 91; *Lohman* v. *Sherwood,* 26 S.E.2d 74 (Va., 1943); *Mills* v. *Shepherd,* 157 P.2d 533 (Kans., 1945); *Hanks* v. *McNeil Coal Corporation,* 168 P.2d 256 (Colo., 1946); 1 Williston *on Contracts, Rev.ed.,* sec. 256, págs. 753–55; Green, *Public Policies Underlying the Law of Mental Incompetency,* 38 Mich.L.Rev. 1189; Green, *Judicial Tests of Mental Incompetency,* 6 Mo.L.Rev. 141; Green, *The Operative Effect of Mental Incompetency on Agreements and Wills,* 21 Tex.L.Rev. 554; Green, *Proofs of Mental Incompetency and the Unexpressed Major Premise,* 53 Yale L.J. 271.

ción de la prueba, no estoy de acuerdo con parte del razonamiento de la opinión de la mayoría en su discusión sobre la locura.(¹ᵃ.)

Por otro lado, creo que la sentencia debe confirmarse por el fundamento de influencia indebida. No puedo convenir con la opinión de la mayoría del Tribunal en que el dolo, según éste se define en el artículo 1221 del Código Civil, incluye la influencia indebida y que la única diferencia entre los dos conceptos es que contrario a la influencia indebida, bajo el dolo un contrato no puede anularse con motivo de las maquinaciones de una tercera persona. Por el contrario, la influencia indebida es un concepto enteramente diferente al dolo, y no está comprendida en éste. Convengo en que, según se define en el artículo 1221, el dolo es un término extremadamente amplio. *Rivera vda. de Hernández* v. *Hernández,* 44 D.P.R. 356. Pero en el dolo, el consentimiento se otorga voluntariamente, si bien inducido fraudulentamente. Esto contrasta con la influencia indebida, la cual según veremos puede o no ser fraudulenta, pero en la que no existe consentimiento, porque el transmitente no ha actuado voluntariamente. *Cf. Pueblo* v. *Marrero,* 69 D.P.R. 363. La diferencia entre los dos conceptos es por tanto de suma importancia y no una mera cuestión de semántica o de nombres.

No creo que el artículo 1217 del Código Civil nos impide resolver que un contrato puede ser declarado nulo debido a influencia indebida. Es cierto que el artículo 1217 provee que ''será nulo el consentimiento prestado por error, violencia, intimidación o dolo.'' Pero los motivos para resolver que no hubo consentimiento, no se limitan a aquellos enumerados en el artículo 1217. Por el contrario, si no ha habido un consentimiento voluntario debido a influencia indebida, no se ha cumplido con los requisitos del artículo 1213.

---

(¹ᵃ) Convengo en que la norma a seguir en casos civiles en cuanto a locura, es determinar si el contratante estaba tan enfermo mentalmente que no podía darse cuenta de la transacción específica; pero no estoy conforme con la discusión del artículo 180 del Código Civil que contiene la opinión de la mayoría.

Me doy cuenta del argumento de que de ordinario la falta de consentimiento hace el contrato inexistente, mientras que un contrato obtenido por influencia indebida, puede ser declarado nulo a opción de la víctima. Pero esta aparente desviación de la lógica se ha hecho en casos de locura, tanto en el derecho civil como en la ley común, con el fin de hacer justicia sustancial. *Cf. Fuentes et al.* v. *The Federal Land Bank,* supra, pág. 213; 1 Williston *on Contracts, Rev. ed.,* sec. 251, pág. 741, *et seq.* Al igual que en casos de locura, creo que la víctima en un caso de influencia indebida puede alegar que el contrato es "inexistente", mientras que la otra parte en el contrato no puede levantar esta cuestión.

Es difícil dar una definición precisa de lo que es influencia indebida. *Restatement, Contracts,* Vol. II, sec. 497, pág. 954, dice que "Cuando una parte se halla bajo el dominio de otra. . . .una transacción inducida por injusta persuasión de la última. . . .ha sido inducida por influencia indebida. . . .". En el análisis final, cada caso depende de sus propios hechos. Y la "cuestión definitiva es si meramente se ejerció influencia en un criterio libre y competente, o si una mente estaba tan dominada como para impedírsele el ejercicio de un criterio independiente." 5 Williston *on Contracts, Rev. ed.,* sec. 1625, pág. 4540. *Véanse Egr* v. *Egr,* 131 P.2d 198 (Ore., 1942); *Trustees of Jesse Parker Williams Hosp.* v. *Nisbet,* 14 S.E. 2d. 64, 79 (Ga., 1941); *Bliss* v. *Bahr,* 87 P.2d 219 (Ore., 1931); *Rondous* v. *Erb,* 4 A.2d 468 (Md., 1939); *Carr* v. *Sacramento Clay Products Co.,* 170 P. 446 (Calif., 1917); *Note, Undue Influence in Intervivos Transactions,* 41 Col.L.Rev. 707; Green, *Fraud, Undue Influence and Mental Incompetency,* 43 Col.L.Rev. 176.

Es cierto que la influencia indebida no se menciona expresamente por su nombre en nuestro Código Civil. Pero ello no trae como resultado que en esta jurisdicción no se pueda obtener un remedio contra los contratos obtenidos mediante influencia indebida. En los últimos años este Tribunal no ha

vacilado en usar conceptos de la ley común. *Ruiz* v. *Ruiz,* 61 D.P.R. 823 (*constructive trust*); *López* v. *South P. R. Sugar Co.,* 62 D.P.R. 238 (*accord and satisfaction*). El consentimiento que tiene por miras el artículo 1213 del Código Civil significa consentimiento libremente prestado. El consentimiento dado bajo influencia indebida no cumple con este requisito. Por tanto, la apelada puede demandar para que se declare nulo tal contrato aun bajo el derecho civil. Véanse *Suárez et al.* v. *Banco Territorial y Agrícola,* 16 D.P.R. 630, 635; *Cruz* v. *López et al.,* 17 D.P.R. 42, 47–48; Holstein, *Vices of Consent in the Law of Contracts,* 13 Tulane L.Rev. 560, 573, nota 248. *Cf. Succession of Molaison,* 34 S.2d 897, 903 (La., 1948), comentado en 23 Tulane L.Rev. 250.

Al tratar de determinar si se había ejercido influencia indebida sobre Ramón, la corte inferior primeramente consideró su condición mental. Esto fué un enfoque correcto, ya que la debilidad mental del trasmitente, si bien por sí sola no es suficiente, es altamente material en cuanto a la cuestión de influencia indebida. *Allore* v. *Jewell,* 94 U.S. 506; *Lohman* v. *Sherwood,* supra; *Floyd* v. *Green,* 188 So. 867 (Ala., 1939); *Griffin* v. *Mays,* 82 P.2d 836 (Okla., 1938); 5 Williston, supra, sec. 1625A, pág. 4542; 1 Id., sec. 256, pág. 274.

Al apreciar la evidencia sobre la influencia indebida, la corte de distrito llegó a la conclusión de que Ramón era un "débil mental".(²) El récord contiene abundante prueba en apoyo de esta conclusión. Por consiguiente la acepto.

Luego la corte inferior pasó a determinar si Ramón había recibido adecuada causa o consideración en la transacción.

---

(²)La corte de distrito dió por probado que Ramón tenía una edad mental de 12 años, con un cociente de inteligencia de 75 por ciento; que sufría de oligofrenia, que es un grado deficiente de la inteligencia; que su conducta era impulsada por emociones fortuitas; que era mentalmente incapaz de entender el alcance de una transacción económica que envolviera miles de dólares, o de determinar si recibía o no adecuada compensación al transigir una transacción comercial, o de estimar el verdadero valor del dinero; que tendía a ser un morón; que era un débil mental y un torpe dentro del promedio de la comunidad; que era muy emotivo. sensible a cualquier estímulo y mentalmente anormal.

Aquí también actuó correctamente, ya que la prueba de que la causa fué inadecuada, tiene gran peso sobre la cuestión de influencia indebida. 5 Williston, supra, sec. 1625A, págs. 4541–42; *Restatement, Contracts,* Vol. II, sec. 497, pág. 955, Comentario b; *Hanks* v. *McNeil Coal Corporation,* supra; *Floyd* v. *Green,* supra.

Al argumentar que la causa recibida por Ramón fué adecuada, los apelantes exponen diez fundamentos. Algunos aparecen de la escritura de transacción. Otros de la declaración de Adolfo Porrata—el abogado que representó a Ramón al negociar y otorgar la escritura de transacción—aunque no de la escritura. Y otros aparecen por primera vez en el alegato de los apelantes. En su opinión la corte de distrito dijo de paso que la declaración de Porrata defendiendo la transacción fué "bastante plausible". Pero no creyó su explicación, a pesar de esta suave caracterización, ya que resolvió que la causa fué "irrisoria". He examinado estos diez fundamentos y convengo con la corte inferior en que la consideración para la transacción fué extremadamente inadecuada.

El primer fundamento fué que en su testamento Pastor Díaz no mencionó a Ramón y dispuso de su tercio de libre disposición afirmando que no tenía hijos naturales. Pero la preterición de Ramón en el testamento no afecta sus derechos, siempre y cuando pudiera establecer su *status* en el pleito de filiación. En verdad, el propio Ignacio radicó demanda para anular el testamento y mediante convenio entre él y la segunda esposa de Pastor el testamento fué declarado nulo.

El segundo fundamento es que la reclamación de gananciales hecha por la viuda de Pastor redujo el caudal hereditario y amenazaba con pleitos a Ignacio, a Ramón y a la viuda. Este punto no fué mencionado en la escritura de transacción ni en la declaración de Porrata. Aparece por primera vez en el alegato de los apelantes. De todos modos, aun suponiendo que la viuda tuviera derecho a la mitad de los bienes, como gananciales, la participación de Ramón excedía por mucho de $10,000.

El tercer fundamento es que había que liquidar ciertas cuentas y obligaciones pendientes, antes de que se pudiera distribuir la herencia entre los herederos. No hay evidencia en el récord en cuanto al importe de estas supuestas obligaciones. La única prueba que tiene algo que ver con este punto es que cuando Ignacio radicó la planilla de contribución de herencia, ya había deducido del caudal las deudas pendientes de pago. Y pagó contribución sobre la suma de $76,053.21, que declaró en la planilla correspondía a la participación de Ramón. En su consecuencia, aun después de deducir todas las obligaciones pendientes y las participaciones de los otros, la participación de Ramón, de acuerdo con la propia declaración de Ignacio, ascendía a $76,053.21. Y la otra evidencia del caso indica que era considerablemente mayor.

Son igualmente insostenibles los fundamentos restantes. Es obvio que la deuda de Ignacio por los gastos de entierro y por algunas contribuciones sobre la propiedad, no reveladas, pero indudablemente modestas, no podía operar para hacer que la causa fuera adecuada. De igual manera, la especulación sobre una administración judicial costosa, que nunca se llevó a cabo, y la amenaza de pleitos contra la herencia, cuyos detalles no se dieron, no pueden invocarse.

Los apelantes alegan que estos diez fundamentos conllevan la validez de la transacción, a la luz de *McCormick* v. *McCormick*, 52 D.P.R. 691. En vista de la anterior discusión, el caso de *McCormick* no es aplicable. Además, en dicho caso no hubo sugestión o contención bien de que la transacción se obtuviera mediante influencia indebida o de que la consideración fuera extremadamente inadecuada.

Los apelantes alegan asimismo que en vista del caso de *McCormick* la corte inferior debió haber considerado, con respecto a lo adecuado de la causa, lo siguiente: (1) era debatible el revivir el pleito de filiación, luego de haber éste permanecido inactivo durante veintisiete años; (2) dicho pleito contenía prueba de que la madre de Ramón había tenido relaciones

sexuales con otros hombres durante el período de su concepción, y este Tribunal revocó la sentencia de la corte de distrito a favor del demandante por dicho motivo; (3) la revocación exigía un nuevo juicio y fué este requisito de nuevo juicio con todas sus implicaciones legales lo que sirvió de base a la transacción; y (4) el demandante no estaba inscrito en el Registro Demográfico, y prueba de su filiación era problemática.

No encuentro méritos en (1) y (3). Bajo las circunstancias de este caso, Ramón claramente tenía derecho a un nuevo juicio en el pleito de filiación, a pesar de que el caso no se había de hecho señalado para verse de nuevo durante veintisiete años.

En cuanto a (2), como cuestión de hecho no hubo tal prueba en el primer juicio. Hubo una oferta de prueba y resolvimos que la corte inferior erró al no admitirla. *Rivera* v. *Díaz*, 19 D.P.R. 548. Y para completar el cuadro de los esfuerzos para evitar el reconocimiento de Ramón como hijo natural de Pastor Díaz, véanse *El Pueblo* v. *Díaz et al.*, 22 D.P.R. 191, o *In re Abella*, 25 D.P.R. 744.

En cuanto a (4), es inmaterial a este caso—o al de filiación—si Ramón estaba o no inscrito en el Registro Demográfico.

Finalmente, los apelantes descansan en *Cabanillas* v. *Cabanillas et al.*, 33 D.P.R. 777, y *Sosa Fernández* v. *Sosa Oliva*, 35 D.P.R. 1025. Véase también *Sucesión Gómez* v. *Colón*, supra, pág. 107. Estos casos resuelven que la mera liberalidad o generosidad entre parientes es suficiente causa o consideración en el derecho civil. Me es difícil creer que los apelantes nos pidan seriamente que, con este récord a la vista, resolvamos que al otorgar la escritura de transacción, Ramón, un semianalfabeto, pobre, morón, hijo natural del testador, actuara impulsado por liberalidad hacia Ignacio, hijo legítimo del acaudalado finado. Sea ello como fuere, la cuestión ahora no es si hubo suficiente causa para obligar a las

partes.  Más bien trato de determinar si hubo alguna influencia indebida.  Y sobre esta última cuestión, aun cuando la causa sea técnicamente suficiente, el que sea tan inadecuada es evidencia sustancial de influencia indebida.

Estoy convencido de que la mayoría de los diez fundamentos presentados por los apelantes para justificar la transacción son ideas tardías.  En verdad, la declaración de Porrata defendiendo la transacción está en conflicto con una carta discutida más adelante en la que Porrata dice que por lo menos debieron recibirse $25,000.  Por consiguiente, convengo con la corte inferior en que la causa para la transacción fué extremadamente inadecuada.

En vista de la debilidad mental de Ramón, la causa inadecuada y de otros hechos que seguidamente consideraremos, la corte inferior resolvió que la escritura de transacción era nula debido a "fraude e influencia indebida".  En otras palabras, la escritura se obtuvo mediante fraudulenta influencia indebida ejercida sobre Ramón con el fin de beneficiar a Ignacio y perjudicar a Ramón.  Esto es así de conformidad con la doctrina de que la influencia indebida es con frecuencia, si bien no necesariamente, fraudulenta.  5 Williston, supra, sec. 1625, págs. 4540–41.

En su opinión la corte de distrito declaró probados once incidentes que ella llama indicios de influencia indebida.  Algunos se refieren a la condición mental de Ramón y a lo inadecuado de la causa.  El resto se refiere a otras circunstancias tendientes a demostrar la influencia indebida.  Estos incidentes declarados probados por la corte fueron substancialmente los siguientes:

1. Ramón estaba ansioso de obtener dinero, principalmente para comprar un automóvil, una motocicleta o un aeroplano. Porrata le satisfizo este deseo haciéndole gestiones el día antes de la transacción para obtenerle una licencia de conductor de vehículos de motor.

2. Los bienes dejados por R. Pastor Díaz eran cuantiosos, mientras que Ramón transigió sus derechos tan sólo por $10,000.

3. Ramón recibió solamente $5,000 como resultado de la transacción, ya que los otros $5,000 fueron a manos de sus abogados.

4. El hijo legítimo y la viuda, sus abogados y *los abogados de Ramón,* tenían todos sus motivos especiales para finalizar los pleitos. Por otro lado, Ramón era altamente impresionable y no comprendió el alcance de la transacción, siendo su principal, si no su único objetivo, comprar un automóvil, una motocicleta o un aeroplano.

5. Si bien Ramón sólo recibió $10,000, de los cuales sus abogados cobraron $5,000, la declaración de herencia hecha por Ignacio decía que la participación de Ramón fué de $76,053.21. A lo menos, esto fué un fraude al erario público.

6. Porrata exigió a la madre de Ramón que firmara el contrato por sus servicios profesionales, no obstante el hecho de que Ramón era mayor de edad. Esto tiende a demostrar que Porrata sabía que Ramón era un incapacitado o débil mental. (En este momento la corte inferior añadió que no estaba convencida de que la madre de Ramón estuviera presente cuando se otorgó la escritura de transacción).

7. Desde fines de noviembre del 1939 y hasta que se firmó la escritura de transacción el 28 de febrero de 1940, los gastos de Ramón y de su madre mientras permanecieron en Guayama fueron sufragados por Porrata, ante quien como notario se otorgó la escritura de transacción.

8. El hecho de que el pleito de filiación se estuviera transigiendo debe tenerse en cuenta en vista de la prohibición del artículo 1713 del Código Civil contra la transacción de un pleito que envuelva el estado civil de las personas.

9. El convenio preliminar de transacción fué firmado por Ramón solamente. Y disponía que Ignacio no pondría obstáculo o dificultad alguna en el pleito de filiación. Esto de-

muestra que las partes estaban transigiendo el caso que envolvía el estado civil de Ramón.(³)

10. En su declaración Porrata insistió en que Rafael Cividanes no participó en la transacción. La prueba demuestra lo contrario. De ella surge que Cividanes llevó a Ramón a Mayagüez y tomó parte allí y en otros sitios en conversaciones que envolvían el pleito de filiación y la herencia. Cuatro días después del otorgamiento de la escritura de transacción, Porrata le escribió a Cividanes que ". . . tus actuaciones en el caso no sólo me perjudicaron sino que me obligaron a transigir por $10,000 cuando yo he podido sacar $25,000 que era lo que razonablemente debía haberse pagado." De su faz esto es una admisión de Porrata al efecto de que no importa cuáles hubieran sido sus motivos, él transigió la reclamación de Ramón por una suma extremadamente inadecuada en perjuicio de Ramón.

11. El no haber utilizado a Ramón, quien estaba presente, como testigo en el caso de filiación demuestra que Porrata conocía su condición mental.(⁴)

La corte inferior entonces dijo que "no sólo concluímos que Ramón Díaz Rivera era un débil mental, sino también que para obtener su firma en el Contrato de Transacción de 28 de febrero de 1940 se ejerció por otros indebida influencia sobre él." Creo que la corte de distrito debió ser más específica: debió haber identificado los "otros" que ejercieron la influencia indebida. Pero surge claro de las conclusiones de hecho, de la opinión en su totalidad y de la prueba, que lo que la corte inferior quiso decir fué que la influencia indebida había sido ejercida principalmente por Porrata.

(³)En cuanto a las conclusiones 8 y 9 no es necesario determinar si convengo en que el artículo 1713 fué infringido. Según indico más adelante, aun cuando la transacción no violó técnicamente el artículo 1713, sus propios términos y la manera en que se negoció, son indicios de influencia indebida.

(⁴)A los fines de la claridad, he parafraseado un poco el lenguaje que la corte de distrito empleó al exponer estas conclusiones. Al así hacerlo, no creo que haya alterado su significado. De todos modos, la relación de las conclusiones de hecho de la corte inferior, al ser expuesta de nuevo por mí, está ampliamente justificada por la prueba.

En adición a estas once conclusiones de la corte de distrito, noto lo siguiente:

1. Ramón le decía repetidamente a todo el que le prestara atención que lo único que le interesaba era conseguir un aeroplano o una motocicleta, no obstante el hecho de que estaba envuelta su supuesta participación de una tercera parte de una herencia que se alegaba ascendía a $600,000.

2. La madre de Ramón le advirtió a Porrata que su hijo era un débil mental, un incapacitado y que no podía valerse por sí solo. Ella y Porrata convinieron en que ella estaría presente si se firmaba alguna escritura de transacción. El propio Porrata parece que creyó que esto era aconsejable al estar envueltos sus propios intereses: a pesar del hecho de que Ramón era mayor de edad, él hizo que la madre así como Ramón firmaran con él el contrato por sus servicios profesionales. Porrata violó su convenio de que la madre estuviera presente, al hacer que Ramón firmara la escritura estando ella ausente.

3. Las partes celebraron un convenio preliminar de transacción el 19 de enero de 1940. El documento original que contenía esa transacción fué firmado por Ignacio y Ramón y lo retuvo Agustín Font, abogado de Ignacio. La copia con que se quedó Porrata fué firmada por Ramón, pero no por Ignacio. En efecto práctico, Porrata, con el conocimiento de Font y de Ignacio, puso con ello a Ramón en una posición en que Ramón, pero no Ignacio, venía obligado por el convenio preliminar.

4. Ramírez Viñas, un abogado que también actuaba a nombre de Ramón, declaró que Porrata le había dicho el 28 de febrero de 1940, en presencia de Ignacio y de Font, que el caso se había transigido por $7,500; que él protestó de que la suma era inadecuada; y que Porrata le contestó que estaban celebrando conversaciones en un esfuerzo para aumentar la cantidad a $10,000. Porrata le hizo estas manifestaciones a Ramírez Viñas sin que Ignacio o Font protestaran,

a pesar del hecho de que el convenio preliminar de transacción por $10,000 ya había sido firmado el 19 de enero de 1940.

5. La escritura de transacción dice que la suma de $10,000 le era entregada a Ramón en el acto de su otorgamiento. Pero él nunca recibió los $10,000. Se le dieron $500 en efectivo, y un certificado de depósito de $4,500 el día antes de la transacción. Sus abogados recibieron un certificado de depósito de $10,000. En adición a la luz que esto arroje sobre la naturaleza de la transacción, aun cuando Porrata le hubiera rendido fielmente sus servicios a Ramón, él y sus asociados escasamente tenían derecho, bajo las circunstancias concurrentes, a un cincuenta por ciento del importe de la transacción.

6. Los apelantes citaron a Font como su testigo. Sin embargo, a pesar de las serias implicaciones de este caso en cuanto a la conducta de Porrata y de Font, éste no prestó testimonio en el caso.

Las once conclusiones de hecho de la corte inferior, junto a los incidentes expuestos en los últimos seis párrafos y el récord en su totalidad, me convencen de que Porrata, Ignacio y Agustín Font, abogado de Ignacio, sabían todos antes de la transacción, que Ramón era un débil mental; de que Ignacio sabía que la causa era extremadamente inadecuada; de que Porrata, no importa cuáles pudieran ser sus motivos, actuaba en beneficio de los intereses de Ignacio y no de los de Ramón; y de que Ignacio y Font sabían que Porrata actuaba en dicha forma.

De ordinario, una conclusión sobre existencia de fraude no puede basarse en conjeturas o sospechas. La prueba debe ser sólida, clara y convincente. *Serrano* v. *Torres,* 61 D.P.R. 162, 166; *Sucesión Gómez* v. *Colón,* supra. Pero se requiere un grado menor de prueba para establecer un caso de influencia indebida, ya fuere fraudulenta o no, cuando, como ocurre aquí, existe la debilidad mental. *Nelson et al.* v. *Doheny*

*et al.,* 30 F.2d 748 (C.C.A., D.C., 1929); *Sulzberger* v. *Sulzberger,* 23 N.E.2d 46 (Ill., 1939); *Moore* v. *Horne,* 136 S.W.2d 638 (Tex., 1940). Además, la corte inferior resolvió en efecto que Porrata negociaba con su cliente mentalmente débil en beneficio de Ignacio. Si un abogado negocia con su cliente en beneficio propio o en el de un tercero, el peso de la prueba recae sobre él o sobre el tercero para demostrar que la transacción fué razonable y que el convenio efectuado por el trasmitente respondía a su espontánea voluntad. *Lochinger* v. *Hanlon,* 33 A.2d 1 (Pa., 1943); *Bliss* v. *Bahr,* supra; *Floyd* v. *Green,* supra; *Addis* v. *Grange,* 192 N.E. 774 (Ill., 1934); *Trustees of Jesse Parker Williams Hosp.* v. *Nisbet,* supra; *Egr* v. *Egr,* supra; 5 Williston, supra, sec. 1625A, págs. 4542-45; *Restatement, Contracts,* Vol. II, sec. 498, pág. 956. Los apelantes no cumplieron con dicho requisito. Por el contrario, del récord surge que la transacción fué irrazonable y que Ramón no prestó su consentimiento libremente.

Por último, noto que aun cuando Ignacio no ejerciera influencia indebida por sí mismo, el hecho de que tenía conocimiento de la influencia indebida que se ejercía en su beneficio, daba derecho a la demandante a tratar como nula la transacción. Véanse *Suárez et al.* v. *El Banco Territorial y Agrícola,* supra, pág. 635; 5 Williston, supra, sec. 1622, págs. 4534-5; *Restatement, Contracts,* sec. 496, pág. 953, sec. 477, pág. 912; *Addis* v. *Grange,* supra; *Annotation,* 96 A.L.R. 613.

Los apelantes alegan que a base de "impedimento por escritura y por sentencia" Ramón estaba impedido de anular la escritura del 28 de febrero de 1940. Su teoría es que Ramón no puede sostener que él estuviera incapacitado en dicha fecha, ya que ese mismo día el había comparecido en su propio nombre en el caso de filiación y había obtenido sentencia en el mismo. Citan los casos de *The Plantations Co.* v. *Smith,* 23 D.P.R. 394, y *Figueroa* v. *Figueroa et al.,* 23 D.P.R. 438.

Según mi punto de vista para resolver esta contención, basta decir que no basaría la sentencia en este caso en falta de capacidad de Ramón. Más aún, si dicha cuestión está envuelta aquí, en vista de la opinión de la mayoría de este Tribunal, no podría ser resuelta meramente señalando un pleito anterior en que el supuesto incapacitado compareció como demandante en su propio nombre.

Arguyen los apelantes que carece de base la manifestación de la corte inferior de que las partes habían transigido un pleito en el cual estaba envuelto un estado civil, en violación del artículo 1713 del Código Civil, ed. de 1930.(⁵) Es cierto que la corte de distrito hizo esta manifestación, indudablemente basándose en *Pagán* v. *Sucesión Padilla,* 42 D.P.R. 968. En dicho caso las partes firmaron y radicaron en el pleito de filiación ante la corte de distrito un convenio mediante el cual los demandados se "allanaban" a la súplica de que el demandante fuera declarado hijo natural. El convenio también contenía una transacción en cuanto a los derechos hereditarios del demandante. Resolvimos que todo el convenio era nulo porque infringía el artículo 1713.

Aquí el convenio preliminar del 19 de enero de 1940 decía que parte de la causa era que Ignacio no pondría obstáculo o dificultad a que se dictara sentencia a favor de Ramón en el pleito de filiación. Este convenio virtualmente le aseguró a Ramón una sentencia favorable en el pleito de filiación. En verdad, el récord demuestra que el juicio fué *pro forma*. Font, abogado de Ignacio, anunció al comenzar el juicio que él no tenía testigos. Nadie compareció a nombre de la segunda esposa de Pastor Díaz. El propio Ramón no declaró. Font no contrainterrogó a ninguno de los testigos, con excepción de una o dos preguntas frívolas e irrelevantes que le hizo a uno. Y la corte inferior, que aparentemente no había sido informada de la transacción, no comprendía por qué no se

(⁵) El artículo 1713 provee que "No se puede transigir sobre el estado civil de las personas, ni sobre las cuestiones matrimoniales, ni sobre alimentos futuros."

había anotado la rebeldía. Luego de dictar la corte de distrito la sentencia en el pleito de filiación, el mismo día se firmó la escritura definitiva de transacción. Sin mencionar el acuerdo preliminar del 19 de enero de 1940, la escritura de transacción dice que se otorgaba en consideración a los $10,000 y también en consideración al hecho de que Ignacio no se había opuesto en el pleito de filiación a que se decretase que Ramón era hijo natural reconocido de Pastor Díaz.

Bajo las circunstancias anteriores, quizás se pudiera alegar que el caso de *Pagán* es de aplicación y que la transacción aquí envuelta era nula por violar el artículo 1713. *Cf. Valdés* v. *Hastrup*, 64 D.P.R. 595. Sin embargo, creo innecesario decidir esta cuestión ya que preferiría basar nuestra decisión en otros motivos. La corte inferior asumió una posición parecida. No declaró nula la escritura por el fundamento de que infringía el artículo 1713. En vez de decidir el caso a base de eso, dijo que la supuesta infracción del artículo 1713 era uno de los indicios de influencia indebida, y predicó su decisión en influencia indebida. Creo que la corte inferior correctamente consideró estos hechos como indicios de influencia indebida.

Los apelantes también se quejan de la resolución de la corte inferior de que este pleito no está prescrito. Alegan los apelantes que el pleito no procede por impedirlo el artículo 1253, Código Civil, ed. de 1930, que establece un término prescriptivo de cuatro años. Esta acción se radicó aproximadamente cinco años después del otorgamiento de la escritura de transacción. En su consecuencia, el pleito está prescrito si el artículo 1253 es aplicable.([6])

Como hemos visto, un contrato obtenido mediante influencia indebida vicia el consentimiento del trasmitente. Este

---

([6]) El artículo 1253 prescribe:

"La acción de nulidad sólo durará cuatro años.

"Este tiempo empezará a correr:

"En los casos de intimidación o violencia, desde el día en que éstas hubiesen cesado;

por consiguiente puede, a su opción, entablar un procedimiento para declararlo nulo. Las acciones de nulidad enumeradas en el artículo 1253 prescriben a los cuatro años. Pero este pleito, predicado en la falta de consentimiento por razón de haberse ejercido influencia indebida, no se encuentra entre ellas. *Cf. Oliver et al.* v. *Oliver,* 23 D.P.R. 181; *Cruz* v. *Sucesión de Gregorio Kuinlan,* 29 D.P.R. 877; *Solá* v. *Castro,* 32 D.P.R. 804; *González* v. *Fumero,* 38 D.P.R. 556. En su consecuencia, según el artículo 1864 del Código Civil, esta acción prescribe solamente después de transcurridos quince años. Por tanto, la acción se radicó a tiempo y la defensa de prescripción no procede.

En verdad, una de las más importantes virtudes de la doctrina de influencia indebida es que evita los efectos de un término prescriptivo extremadamente riguroso. A tenor con el artículo 1253 la prescripción empieza a correr desde la consumación del contrato y no, como debiera ser, cuando se descubre el dolo. Como resultado, el artículo 1253, según lee hoy día, premia la ocultación del dolo.

Desde luego, la mejor respuesta a todo este problema sería el que la Asamblea Legislativa incluyera la influencia indebida en el artículo 1217 como fundamento para la nulidad del consentimiento y enmendara el artículo 1253 en el sentido de que el término prescriptivo empieza a correr desde la fecha en que se descubren los motivos de nulidad y no desde la fecha de la consumación del contrato. En vista de que la Asamblea Legislativa en los últimos años ha demostrado un laudable interés en los derechos de los hijos naturales, no creo que esté de más el que llame su atención hacia este asunto.

---

"En los de error, o dolo, o falsedad de la causa, desde la consumación del contrato;

"Cuando la acción se dirija a invalidar contratos hechos por mujer casada, sin licencia o autorización competente, desde el día de la disolución del matrimonio;

"Y cuando se refiera a los contratos celebrados por los menores o incapacitados, desde que salieren de tutela.''

Finalmente, los apelantes sostienen que la sentencia es errónea porque las alegaciones no planteaban la cuestión de influencia indebida, sino únicamente la incapacidad mental y el fraude. En este estado del caso ya no se permite que supuestos errores de esta índole en cuanto a las alegaciones, afecten el resultado de los pleitos en esta jurisdicción. Regla 15(*b*), Reglas de Enjuiciamiento Civil. Véanse *Núñez* v. *Benítez, Rector*, 65 D.P.R. 864; *López* v. *Saldaña*, 68 D.P.R. 971.([7])

Creo que la sentencia debiera confirmarse por los motivos antes expuestos.

---

([7])En vista de la discusión que hago en cuanto a la conducta de Porrata Doria, huelga añadir que me uno a la mayoría del tribunal al ordenar una investigación de la misma.